# DOGGETT *v.* UNITED STATES

No. 90–857.   Argued October 9, 1991—Reargued February 24, 1992—
Decided June 24, 1992

Souter, J., delivered the opinion of the Court, in which White, Black-mun, Stevens, and Kennedy, JJ., joined. O'Connor, J., filed a dissenting opinion, *post*, p. 658. Thomas, J., filed a dissenting opinion, in which Rehnquist, C. J., and Scalia, J., joined, *post*, p. 659.

*Wm. J. Sheppard* reargued the cause for petitioner. With him on the briefs was *Elizabeth L. White.*

*Deputy Solicitor General Bryson* reargued the cause for the United States. *Assistant Attorney General Mueller* argued the cause for the United States on the original argument. With them on the briefs were *Solicitor General Starr, Ronald J. Mann,* and *Patty Merkamp Stemler.*

Justice Souter delivered the opinion of the Court.

In this case we consider whether the delay of 8½ years between petitioner's indictment and arrest violated his Sixth Amendment right to a speedy trial. We hold that it did.

I

On February 22, 1980, petitioner Marc Doggett was indicted for conspiring with several others to import and distribute cocaine. See 84 Stat. 1265, 1291, as amended, 21 U. S. C. §§ 846, 963. Douglas Driver, the Drug Enforcement Administration's (DEA's) principal agent investigating the conspiracy, told the United States Marshal's Service that the DEA would oversee the apprehension of Doggett and his confederates. On March 18, 1980, two police officers set out

under Driver's orders to arrest Doggett at his parents' house in Raleigh, North Carolina, only to find that he was not there. His mother told the officers that he had left for Colombia four days earlier.

To catch Doggett on his return to the United States, Driver sent word of his outstanding arrest warrant to all United States Customs stations and to a number of law enforcement organizations. He also placed Doggett's name in the Treasury Enforcement Communication System (TECS), a computer network that helps Customs agents screen people entering the country, and in the National Crime Information Center computer system, which serves similar ends. The TECS entry expired that September, however, and Doggett's name vanished from the system.

In September 1981, Driver found out that Doggett was under arrest on drug charges in Panama and, thinking that a formal extradition request would be futile, simply asked Panama to "expel" Doggett to the United States. Although the Panamanian authorities promised to comply when their own proceedings had run their course, they freed Doggett the following July and let him go to Colombia, where he stayed with an aunt for several months. On September 25, 1982, he passed unhindered through Customs in New York City and settled down in Virginia. Since his return to the United States, he has married, earned a college degree, found a steady job as a computer operations manager, lived openly under his own name, and stayed within the law.

Doggett's travels abroad had not wholly escaped the Government's notice, however. In 1982, the American Embassy in Panama told the State Department of his departure to Colombia, but that information, for whatever reason, eluded the DEA, and Agent Driver assumed for several years that his quarry was still serving time in a Panamanian prison. Driver never asked DEA officials in Panama to check into Doggett's status, and only after his own fortuitous assignment to that country in 1985 did he discover Doggett's depar-

ture for Colombia. Driver then simply assumed Doggett had settled there, and he made no effort to find out for sure or to track Doggett down, either abroad or in the United States. Thus Doggett remained lost to the American criminal justice system until September 1988, when the Marshal's Service ran a simple credit check on several thousand people subject to outstanding arrest warrants and, within minutes, found out where Doggett lived and worked. On September 5, 1988, nearly 6 years after his return to the United States and 8½ years after his indictment, Doggett was arrested.

He naturally moved to dismiss the indictment, arguing that the Government's failure to prosecute him earlier violated his Sixth Amendment right to a speedy trial. The Federal Magistrate hearing his motion applied the criteria for assessing speedy trial claims set out in *Barker* v. *Wingo*, 407 U. S. 514 (1972): "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Id.*, at 530 (footnote omitted). The Magistrate found that the delay between Doggett's indictment and arrest was long enough to be "presumptively prejudicial," Magistrate's Report, reprinted at App. to Pet. for Cert. 27–28, that the delay "clearly [was] attributable to the negligence of the government," *id.*, at 39, and that Doggett could not be faulted for any delay in asserting his right to a speedy trial, there being no evidence that he had known of the charges against him until his arrest, *id.*, at 42–44. The Magistrate also found, however, that Doggett had made no affirmative showing that the delay had impaired his ability to mount a successful defense or had otherwise prejudiced him. In his recommendation to the District Court, the Magistrate contended that this failure to demonstrate particular prejudice sufficed to defeat Doggett's speedy trial claim.

The District Court took the recommendation and denied Doggett's motion. Doggett then entered a conditional guilty plea under Federal Rule of Criminal Procedure 11(a)(2),

expressly reserving the right to appeal his ensuing conviction on the speedy trial claim.

A split panel of the Court of Appeals affirmed. 906 F. 2d 573 (CA11 1990). Following Circuit precedent, see *Ringstaff* v. *Howard*, 885 F. 2d 1542 (CA11 1989) (en banc), the court ruled that Doggett could prevail only by proving "actual prejudice" or by establishing that "the first three *Barker* factors weigh[ed] heavily in his favor." 906 F. 2d, at 582. The majority agreed with the Magistrate that Doggett had not shown actual prejudice, and, attributing the Government's delay to "negligence" rather than "bad faith," *id.*, at 578–579, it concluded that *Barker*'s first three factors did not weigh so heavily against the Government as to make proof of specific prejudice unnecessary. Judge Clark dissented, arguing, among other things, that the majority had placed undue emphasis on Doggett's inability to prove actual prejudice.

We granted Doggett's petition for certiorari, 498 U. S. 1119 (1991), and now reverse.

## II

The Sixth Amendment guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial . . . ." On its face, the Speedy Trial Clause is written with such breadth that, taken literally, it would forbid the government to delay the trial of an "accused" for any reason at all. Our cases, however, have qualified the literal sweep of the provision by specifically recognizing the relevance of four separate enquiries: whether delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result. See *Barker, supra,* at 530.

The first of these is actually a double enquiry. Simply to trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the

threshold dividing ordinary from "presumptively prejudicial" delay, 407 U. S., at 530–531, since, by definition, he cannot complain that the government has denied him a "speedy" trial if it has, in fact, prosecuted his case with customary promptness. If the accused makes this showing, the court must then consider, as one factor among several, the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim. See *id.*, at 533–534. This latter enquiry is significant to the speedy trial analysis because, as we discuss below, the presumption that pretrial delay has prejudiced the accused intensifies over time. In this case, the extraordinary 8½-year lag between Doggett's indictment and arrest clearly suffices to trigger the speedy trial enquiry;[1] its further significance within that enquiry will be dealt with later.

As for *Barker*'s second criterion, the Government claims to have sought Doggett with diligence. The findings of the courts below are to the contrary, however, and we review trial court determinations of negligence with considerable deference. See *Cooter & Gell* v. *Hartmarx Corp.*, 496 U. S. 384, 402 (1990); *McAllister* v. *United States*, 348 U. S. 19, 20–22 (1954); 9 C. Wright & A. Miller, Federal Practice and Procedure § 2590 (1971). The Government gives us nothing to gainsay the findings that have come up to us, and we see nothing fatal to them in the record. For six years, the Government's investigators made no serious effort to test their progressively more questionable assumption that Doggett

---

[1] Depending on the nature of the charges, the lower courts have generally found postaccusation delay "presumptively prejudicial" at least as it approaches one year. See 2 W. LaFave & J. Israel, Criminal Procedure § 18.2, p. 405 (1984); Joseph, Speedy Trial Rights in Application, 48 Ford. L. Rev. 611, 623, n. 71 (1980) (citing cases). We note that, as the term is used in this threshold context, "presumptive prejudice" does not necessarily indicate a statistical probability of prejudice; it simply marks the point at which courts deem the delay unreasonable enough to trigger the *Barker* enquiry. Cf. Uviller, *Barker* v. *Wingo:* Speedy Trial Gets a Fast Shuffle, 72 Colum. L. Rev. 1376, 1384–1385 (1972).

was living abroad, and, had they done so, they could have found him within minutes. While the Government's lethargy may have reflected no more than Doggett's relative unimportance in the world of drug trafficking, it was still findable negligence, and the finding stands.

The Government goes against the record again in suggesting that Doggett knew of his indictment years before he was arrested. Were this true, *Barker*'s third factor, concerning invocation of the right to a speedy trial, would be weighed heavily against him. But here again, the Government is trying to revisit the facts. At the hearing on Doggett's speedy trial motion, it introduced no evidence challenging the testimony of Doggett's wife, who said that she did not know of the charges until his arrest, and of his mother, who claimed not to have told him or anyone else that the police had come looking for him. From this the Magistrate implicitly concluded, Magistrate's Report, reprinted at App. to Pet. for Cert. 42–44, and the Court of Appeals expressly reaffirmed, 906 F. 2d, at 579–580, that Doggett had won the evidentiary battle on this point. Not only that, but in the factual basis supporting Doggett's guilty plea, the Government explicitly conceded that it had

> "no information that Doggett was aware of the indictment before he left the United States in March 1980, or prior to his arrest. His mother testified at the suppression hearing that she never told him, and Barnes and Riddle [Doggett's confederates] state they did not have contact with him after their arrest [in 1980]." 2 Record, Exh. 63, p. 2.

While one of the Government's lawyers later expressed amazement that "that particular stipulation is in the factual basis," Tr. 13 (Mar. 31, 1989), he could not make it go away, and the trial and appellate courts were entitled to accept the defense's unrebutted and largely substantiated claim of

Doggett's ignorance. Thus, Doggett is not to be taxed for invoking his speedy trial right only after his arrest.

## III

The Government is left, then, with its principal contention: that Doggett fails to make out a successful speedy trial claim because he has not shown precisely how he was prejudiced by the delay between his indictment and trial.

## A

We have observed in prior cases that unreasonable delay between formal accusation and trial threatens to produce more than one sort of harm, including "oppressive pretrial incarceration," "anxiety and concern of the accused," and "the possibility that the [accused's] defense will be impaired" by dimming memories and loss of exculpatory evidence. *Barker*, 407 U. S., at 532; see also *Smith* v. *Hooey*, 393 U. S. 374, 377–379 (1969); *United States* v. *Ewell*, 383 U. S. 116, 120 (1966). Of these forms of prejudice, "the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." 407 U. S., at 532. Doggett claims this kind of prejudice, and there is probably no other kind that he can claim, since he was subjected neither to pretrial detention nor, he has successfully contended, to awareness of unresolved charges against him.

The Government answers Doggett's claim by citing language in three cases, *United States* v. *Marion*, 404 U. S. 307, 320–323 (1971), *United States* v. *MacDonald*, 456 U. S. 1, 8 (1982), and *United States* v. *Loud Hawk*, 474 U. S. 302, 312 (1986), for the proposition that the Speedy Trial Clause does not significantly protect a criminal defendant's interest in fair adjudication. In so arguing, the Government asks us, in effect, to read part of *Barker* right out of the law, and that we will not do. In context, the cited passages support nothing beyond the principle, which we have independently

based on textual and historical grounds, see *Marion, supra,* at 313–320, that the Sixth Amendment right of the accused to a speedy trial has no application beyond the confines of a formal criminal prosecution. Once triggered by arrest, indictment, or other official accusation, however, the speedy trial enquiry must weigh the effect of delay on the accused's defense just as it has to weigh any other form of prejudice that *Barker* recognized.[2] See *Moore* v. *Arizona,* 414 U. S. 25, 26–27, and n. 2 (1973); *Barker, supra,* at 532; *Smith, supra,* at 377–379; *Ewell, supra,* at 120.

As an alternative to limiting *Barker,* the Government claims Doggett has failed to make any affirmative showing that the delay weakened his ability to raise specific defenses, elicit specific testimony, or produce specific items of evidence. Though Doggett did indeed come up short in this respect, the Government's argument takes it only so far: consideration of prejudice is not limited to the specifically demonstrable, and, as it concedes, Brief for United States 28, n. 21; Tr. of Oral Arg. 28–34 (Feb. 24, 1992), affirmative proof of particularized prejudice is not essential to every speedy trial claim. See *Moore, supra,* at 26; *Barker, supra,* at 533. *Barker* explicitly recognized that impairment of one's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony "can rarely be shown." 407 U. S., at 532. And though time can tilt the case against either side, see *id.,* at 521; *Loud Hawk, supra,* at 315, one cannot generally be sure which of them it has prejudiced more severely. Thus, we generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify. While

---

[2] Thus, we reject the Government's argument that the effect of delay on adjudicative accuracy is exclusively a matter for consideration under the Due Process Clause. We leave intact our earlier observation, see *United States* v. *MacDonald,* 456 U. S. 1, 7 (1982), that a defendant may invoke due process to challenge delay both before and after official accusation.

such presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria, see *Loud Hawk, supra,* at 315, it is part of the mix of relevant facts, and its importance increases with the length of delay.

## B

This brings us to an enquiry into the role that presumptive prejudice should play in the disposition of Doggett's speedy trial claim. We begin with hypothetical and somewhat easier cases and work our way to this one.

Our speedy trial standards recognize that pretrial delay is often both inevitable and wholly justifiable. The government may need time to collect witnesses against the accused, oppose his pretrial motions, or, if he goes into hiding, track him down. We attach great weight to such considerations when balancing them against the costs of going forward with a trial whose probative accuracy the passage of time has begun by degrees to throw into question. See *Loud Hawk, supra,* at 315–317. Thus, in this case, if the Government had pursued Doggett with reasonable diligence from his indictment to his arrest, his speedy trial claim would fail. Indeed, that conclusion would generally follow as a matter of course however great the delay, so long as Doggett could not show specific prejudice to his defense.

The Government concedes, on the other hand, that Doggett would prevail if he could show that the Government had intentionally held back in its prosecution of him to gain some impermissible advantage at trial. See Brief for United States 28, n. 21; Tr. of Oral Arg. 28–34 (Feb. 24, 1992). That we cannot doubt. *Barker* stressed that official bad faith in causing delay will be weighed heavily against the government, 407 U. S., at 531, and a bad-faith delay the length of this negligent one would present an overwhelming case for dismissal.

Between diligent prosecution and bad-faith delay, official negligence in bringing an accused to trial occupies the mid-

dle ground. While not compelling relief in every case where bad-faith delay would make relief virtually automatic, neither is negligence automatically tolerable simply because the accused cannot demonstrate exactly how it has prejudiced him. It was on this point that the Court of Appeals erred, and on the facts before us, it was reversible error.

*Barker* made it clear that "different weights [are to be] assigned to different reasons" for delay. *Ibid.* Although negligence is obviously to be weighed more lightly than a deliberate intent to harm the accused's defense, it still falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun. And such is the nature of the prejudice presumed that the weight we assign to official negligence compounds over time as the presumption of evidentiary prejudice grows. Thus, our toleration of such negligence varies inversely with its protractedness, cf. *Arizona* v. *Youngblood*, 488 U. S. 51 (1988), and its consequent threat to the fairness of the accused's trial. Condoning prolonged and unjustifiable delays in prosecution would both penalize many defendants for the state's fault and simply encourage the government to gamble with the interests of criminal suspects assigned a low prosecutorial priority. The Government, indeed, can hardly complain too loudly, for persistent neglect in concluding a criminal prosecution indicates an uncommonly feeble interest in bringing an accused to justice; the more weight the Government attaches to securing a conviction, the harder it will try to get it.

To be sure, to warrant granting relief, negligence unaccompanied by particularized trial prejudice must have lasted longer than negligence demonstrably causing such prejudice. But even so, the Government's egregious persistence in failing to prosecute Doggett is clearly sufficient. The lag between Doggett's indictment and arrest was 8½ years, and he would have faced trial 6 years earlier than he did but for the Government's inexcusable oversights. The portion of the

delay attributable to the Government's negligence far exceeds the threshold needed to state a speedy trial claim; indeed, we have called shorter delays "extraordinary." See *Barker, supra,* at 533. When the Government's negligence thus causes delay six times as long as that generally sufficient to trigger judicial review, see n. 1, *supra,* and when the presumption of prejudice, albeit unspecified, is neither extenuated,[3] as by the defendant's acquiescence, *e. g.,* 407 U. S., at 534–536, nor persuasively rebutted,[4] the defendant is entitled to relief.

## IV

We reverse the judgment of the Court of Appeals and remand the case for proceedings consistent with this opinion.

*So ordered.*

JUSTICE O'CONNOR, dissenting.

I believe the Court of Appeals properly balanced the considerations set forth in *Barker* v. *Wingo,* 407 U. S. 514 (1972). Although the delay between indictment and trial was lengthy, petitioner did not suffer any anxiety or restriction on his liberty. The only harm to petitioner from the lapse

---

[3] Citing *United States* v. *Broce,* 488 U. S. 563, 569 (1989), the Government argues that, by pleading guilty, Doggett waived any right to claim that the delay would have prejudiced him had he gone to trial. Brief for United States 30. Yet Doggett did not sign a guilty plea *simpliciter,* but a conditional guilty plea under Federal Rule of Criminal Procedure 11(a)(2), thereby securing the Government's explicit consent to his reservation of "the right to appeal the adverse Court ruling on his Motion to Dismiss for violation of Constitutional Speedy Trial provisions based upon post-indictment delay." Plea Agreement, 2 Record, Exh. 66, p. 1. One cannot reasonably construe this agreement to bar Doggett from pursuing as effective an appeal as he could have raised had he not pleaded guilty.

[4] While the Government ably counters Doggett's efforts to demonstrate particularized trial prejudice, it has not, and probably could not have, affirmatively proved that the delay left his ability to defend himself unimpaired. Cf. Uviller, 72 Colum. L. Rev., at 1394–1395.

of time was potential prejudice to his ability to defend his case. We have not allowed such speculative harm to tip the scales. Instead, we have required a showing of actual prejudice to the defense before weighing it in the balance. As we stated in *United States* v. *Loud Hawk*, 474 U. S. 302, 315 (1986), the "possibility of prejudice is not sufficient to support respondents' position that their speedy trial rights were violated. In this case, moreover, delay is a two-edged sword. It is the Government that bears the burden of proving its case beyond a reasonable doubt. The passage of time may make it difficult or impossible for the Government to carry this burden." The Court of Appeals followed this holding, and I believe we should as well. For this reason, I respectfully dissent.

JUSTICE THOMAS, with whom THE CHIEF JUSTICE and JUSTICE SCALIA join, dissenting.

Just as "bad facts make bad law," so too odd facts make odd law. Doggett's 8½-year odyssey from youthful drug dealing in the tobacco country of North Carolina, through stints in a Panamanian jail and in Colombia, to life as a computer operations manager, homeowner, and registered voter in suburban Virginia is extraordinary. But even more extraordinary is the Court's conclusion that the Government denied Doggett his Sixth Amendment right to a speedy trial despite the fact that he has suffered none of the harms that the right was designed to prevent. I respectfully dissent.

I

We have long identified the "major evils" against which the Speedy Trial Clause is directed as "undue and oppressive incarceration" and the "anxiety and concern accompanying public accusation." *United States* v. *Marion*, 404 U. S. 307, 320 (1971). The Court does not, and cannot, seriously dispute that those two concerns lie at the heart of the Clause, and that neither concern is implicated here. Doggett was

neither in United States custody nor subject to bail during the entire 8½-year period at issue. Indeed, as this case comes to us, we must assume that he was blissfully unaware of his indictment all the while, and thus was not subject to the anxiety or humiliation that typically accompanies a known criminal charge.

Thus, this unusual case presents the question whether, independent of these core concerns, the Speedy Trial Clause protects an accused from two additional harms: (1) prejudice to his ability to defend himself caused by the passage of time; and (2) disruption of his life years after the alleged commission of his crime. The Court today proclaims that the first of these additional harms is indeed an independent concern of the Clause, and on that basis compels reversal of Doggett's conviction and outright dismissal of the indictment against him. As to the second of these harms, the Court remains mum—despite the fact that we requested supplemental briefing on this very point.[1]

I disagree with the Court's analysis. In my view, the Sixth Amendment's speedy trial guarantee does not provide independent protection against either prejudice to an accused's defense or the disruption of his life. I shall consider each in turn.

A

As we have explained, "the Speedy Trial Clause's core concern is impairment of *liberty*." *United States* v. *Loud Hawk*, 474 U. S. 302, 312 (1986) (emphasis added). Whenever a criminal trial takes place long after the events at issue, the defendant may be prejudiced in any number of ways. But "[t]he Speedy Trial Clause does not purport to

---

[1] See 502 U. S. 976 (1991) (directing the parties to brief the question "whether the history of the Speedy Trial Clause of the Sixth Amendment supports the view that the Clause protects a right of citizens to repose, free from the fear of secret or unknown indictments for past crimes, independent of any interest in preventing lengthy pretrial incarceration or prejudice to the case of a criminal defendant").

protect a defendant from all effects flowing from a delay before trial." *Id.*, at 311. The Clause is directed not generally against delay-related prejudice, but against delay-related prejudice to a defendant's liberty. "The speedy trial guarantee is designed to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges." *United States* v. *MacDonald,* 456 U. S. 1, 8 (1982). Thus, "when defendants are not incarcerated or subjected to other substantial restrictions on their liberty, a court should not weigh that time towards a claim under the Speedy Trial Clause." *Loud Hawk, supra,* at 312.

A lengthy pretrial delay, of course, may prejudice an accused's ability to defend himself. But, we have explained, prejudice to the defense is not the sort of impairment of liberty against which the Clause is directed. "Passage of time, whether before or after arrest, may impair memories, cause evidence to be lost, deprive the defendant of witnesses, and otherwise interfere with his ability to defend himself. *But this possibility of prejudice at trial is not itself sufficient reason to wrench the Sixth Amendment from its proper context.*" *Marion, supra,* at 321–322 (footnote omitted; emphasis added). Even though a defendant may be prejudiced by a pretrial delay, and even though the government may be unable to provide a valid justification for that delay, the Clause does not come into play unless the delay impairs the defendant's liberty. "Inordinate delay . . . may impair a defendant's ability to present an effective defense. But the major evils protected against by the speedy trial guarantee exist *quite apart* from actual or possible prejudice to an accused's defense." 404 U. S., at 320 (emphasis added).

These explanations notwithstanding, we have on occasion identified the prevention of prejudice to the defense as an independent and fundamental objective of the Speedy Trial

Clause. In particular, in *Barker* v. *Wingo*, 407 U. S. 514, 532 (1972), we asserted that the Clause was "designed to protect" *three* basic interests: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." See also *Smith* v. *Hooey*, 393 U. S. 374, 377–378 (1969); *United States* v. *Ewell*, 383 U. S. 116, 120 (1966). Indeed, the *Barker* Court went so far as to declare that of these three interests, "the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." 407 U. S., at 532.

We are thus confronted with two conflicting lines of authority, the one declaring that "limit[ing] the possibility that the defense will be impaired" is an independent and fundamental objective of the Speedy Trial Clause, *e. g.*, *Barker*, *supra*, at 532, and the other declaring that it is not, *e. g.*, *Marion*, 404 U. S. 307 (1971); *MacDonald*, *supra*; *Loud Hawk*, *supra*. The Court refuses to acknowledge this conflict. Instead, it simply reiterates the relevant language from *Barker* and asserts that *Marion*, *MacDonald*, and *Loud Hawk* "support nothing beyond the principle . . . that the Sixth Amendment right of the accused to a speedy trial has no application beyond the confines of a formal criminal prosecution." *Ante*, at 654–655. That attempt at reconciliation is eminently unpersuasive.

It is true, of course, that the Speedy Trial Clause by its terms applies only to an "accused"; the right does not attach before indictment or arrest. See *Marion*, *supra*, at 313–315, 320–322; *Dillingham* v. *United States*, 423 U. S. 64, 64–65 (1975) *(per curiam)*. But that limitation on the Clause's protection only confirms that preventing prejudice to the defense is not one of its independent and fundamental objectives. For prejudice to the defense stems from the interval between *crime* and trial, which is quite distinct from the interval between *accusation* and trial. If the Clause were in-

deed aimed at safeguarding against prejudice to the defense, then it would presumably limit *all* prosecutions that occur long after the criminal events at issue. A defendant prosecuted 10 years after a crime is just as hampered in his ability to defend himself whether he was indicted the week after the crime or the week before the trial—but no one would suggest that the Clause protects him in the latter situation, where the delay did not substantially impair his liberty, either through oppressive incarceration or the anxiety of known criminal charges. Thus, while the Court is correct to observe that the defendants in *Marion, MacDonald,* and *Loud Hawk* were not subject to formal criminal prosecution during the lengthy period of delay prior to their trials, that observation misses the point of those cases. With respect to the relevant consideration—*the defendants' ability to defend themselves despite the passage of time*—they were in precisely the same situation as a defendant who had long since been indicted. The initiation of a formal criminal prosecution is simply irrelevant to whether the defense has been prejudiced by delay.

Although being an "accused" is necessary to trigger the Clause's protection, it is not sufficient to do so. The touchstone of the speedy trial right, after all, is the substantial deprivation of liberty that typically accompanies an "accusation," *not* the accusation itself. That explains why a person who has been arrested but not indicted is entitled to the protection of the Clause, see *Dillingham, supra,* even though technically he has not been "accused" at all.[2] And it ex-

---

[2] In this regard, it is instructive to compare the Sixth Amendment's speedy trial right to its right to counsel, which also applies only to an "accused." The right to counsel, we have held, does not attach until " 'at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.' " *United States* v. *Gouveia,* 467 U. S. 180, 188 (1984) (quoting *Kirby* v. *Illinois,* 406 U. S. 682, 689 (1972) (plurality opinion)). In

plains why the lower courts consistently have held that, with respect to sealed (and hence secret) indictments, the protections of the Speedy Trial Clause are triggered *not* when the indictment is *filed,* but when it is *unsealed.* See, *e. g., United States* v. *Watson,* 599 F. 2d 1149, 1156–1157, and n. 5 (CA2 1979), modified on other grounds *sub nom. United States* v. *Muse,* 633 F. 2d 1041 (CA2 1980) (en banc); *United States* v. *Hay,* 527 F. 2d 990, 994, and n. 4 (CA10 1975); cf. *United States* v. *Lewis,* 907 F. 2d 773, 774, n. 3 (CA8 1990).

It is misleading, then, for the Court to accuse the Government of "ask[ing] us, in effect, to read part of *Barker* right out of the law," *ante,* at 654, a course the Court resolutely rejects. For the issue here is not simply whether the relevant language from *Barker* should be read out of the law, but whether that language trumps the contrary logic of *Marion, MacDonald,* and *Loud Hawk.* The Court's protestations notwithstanding, the two lines of authority cannot be reconciled; to reaffirm the one is to undercut the other.

In my view, the choice presented is not a hard one. *Barker's* suggestion that preventing prejudice to the defense is a fundamental and independent objective of the Clause is plainly dictum. Never, until today, have we confronted a case where a defendant subjected to a lengthy delay after indictment nonetheless failed to suffer any substantial impairment of his liberty. I think it fair to say that *Barker* simply did not contemplate such an unusual situation. Moreover, to the extent that the *Barker* dictum purports to elevate considerations of prejudice to the defense to fundamental and independent status under the Clause, it cannot be

other words, for purposes of the right to counsel, an "accused" must *in fact* be accused of a crime; unlike the speedy trial right, it does *not* attach upon arrest. See, *e. g., Gouveia, supra,* at 189–190; *McNeil* v. *Wisconsin,* 501 U. S. 171, 175–176 (1991).

deemed to have survived our subsequent decisions in *Mac-Donald* and *Loud Hawk*.[3]

Just because the Speedy Trial Clause does not independently protect against prejudice to the defense does not, of course, mean that a defendant is utterly unprotected in this regard. To the contrary, "'the applicable statute of limitations . . . is . . . the primary guarantee against bringing overly stale criminal charges,'" *Marion*, 404 U. S., at 322 (quoting *Ewell*, 383 U. S., at 122). These statutes "represent legislative assessments of relative interests of the State and the defendant in administering and receiving justice; they 'are made for the repose of society and the protection of those who may [during the limitation] . . . have lost their means of defence.'" 404 U. S., at 322 (quoting *Public Schools* v. *Walker*, 9 Wall. 282, 288 (1870)). Because such statutes are fixed by the legislature and not decreed by

---

[3] Our summary reversal in *Moore* v. *Arizona*, 414 U. S. 25 (1973) *(per curiam)*, is not to the contrary. The petitioner there was tried for murder in Arizona "[a]lmost three years after he was charged and 28 months after he first demanded that Arizona either extradite him from California, where he was serving a prison term, or drop a detainer against him." *Ibid.* The Arizona Supreme Court denied him speedy trial relief on the ground that "a showing of prejudice to the defense at trial was essential to establish a federal speedy trial claim." *Ibid.* We rejected that reasoning, emphasizing the contextual nature of the speedy trial analysis set forth in *Barker* v. *Wingo*, 407 U. S. 514 (1972).

To hold that a speedy trial claim can succeed without a showing of actual trial prejudice is not, of course, to hold that such a claim can succeed without a showing of *any prejudice at all*. *Moore*, like *Barker*, is clearly premised on the assumption that the defendant invoking the protection of the Speedy Trial Clause has been subjected to the evils against which the Clause was designed to protect. Indeed, *Moore* makes this assumption quite explicit, observing that prejudice is "'inevitably present in every case to some extent, *for every defendant will either be incarcerated pending trial or on bail subject to substantial restrictions on his liberty.*'" *Moore, supra,* at 27 (quoting *Barker, supra,* at 537 (WHITE, J., concurring)) (emphasis added). While accurate in the vast majority of cases, that observation is not inevitably true—as this case shows.

courts on an ad hoc basis, they "provide predictability by specifying a limit beyond which there is an irrebuttable presumption that a defendant's right to a fair trial would be prejudiced." 404 U. S., at 322.

Furthermore, the Due Process Clause always protects defendants against fundamentally unfair treatment by the government in criminal proceedings. See *United States* v. *Lovasco,* 431 U. S. 783 (1977). As we explained in *Marion,* "the Due Process Clause . . . would require dismissal of [an] indictment if it were shown at trial that [a] delay . . . caused substantial prejudice to [a defendant's] rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused." 404 U. S., at 324. See also *MacDonald,* 456 U. S., at 8 ("The Sixth Amendment right to a speedy trial is . . . not primarily intended to prevent prejudice to the defense caused by passage of time; that interest is protected primarily by the Due Process Clause and by statutes of limitations").[4]

---

[4] The result in the case may well be explained by an improvident concession. While the United States argued essentially that a defendant's speedy trial rights cannot be violated where he is neither incarcerated nor subject to the anxiety of known criminal charges, it did not claim that this was invariably so. Instead, the United States conceded that a defendant whose liberty was in no way impaired by a pretrial delay could nevertheless succeed in a speedy trial claim if the government had intentionally caused the delay for the specific purpose of prejudicing the defense or injuring the defendant in some other significant way. The defendant in *this* case is not entitled to relief, the United States asserts, because the delay in bringing him to trial was, at worst, caused by negligence.

Not surprisingly, the Court seizes on this concession with relish. See *ante,* at 655, 656 (citing Brief for United States 28, n. 21, Tr. of Oral Arg. 28–34 (Feb. 24, 1992)). For if defendants can bring successful speedy trial claims even though they have not been "incarcerated or subjected to other substantial restrictions on their liberty," *United States* v. *Loud Hawk,* 474 U. S. 302, 312 (1986), then the Clause's protections necessarily extend beyond those core concerns. If the Clause does not protect a defendant whose liberty has not been impaired by a delay, then it simply does not protect him; its protections cannot be triggered solely by the government's bad motives. The Speedy Trial Clause provides no basis for the line the United States advances between negligent governmental conduct, on the

Therefore, I see no basis for the Court's conclusion that Doggett is entitled to relief under the Speedy Trial Clause *simply* because the Government was negligent in prosecuting him and because the resulting delay may have prejudiced his defense.

## B

It remains to be considered, however, whether Doggett is entitled to relief under the Speedy Trial Clause because of the disruption of his life years after the criminal events at issue. In other words, does the Clause protect a right to repose, free from secret or unknown indictments? In my view, it does not, for much the same reasons set forth above.

The common law recognized no right of criminals to repose. "The maxim of our law has always been 'Nullum tempus occurrit regi,' ['time does not run against the king'], and as a criminal trial is regarded as an action by the king, it follows that it may be brought at any time." 2 J. Stephen, A History of the Criminal Law of England 1, 2 (1883) (noting examples of delays in prosecution ranging from 14 to 35 years). See also F. Wharton, Criminal Pleading and Prac-

---

one hand, and bad-faith conduct, on the other. As noted in text, the *Due Process Clause* is the proper recourse for an accused whose defense is materially prejudiced by bad-faith governmental behavior. See *United States* v. *Lovasco*, 431 U. S. 783 (1977); cf. *Arizona* v. *Youngblood*, 488 U. S. 51 (1988).

The Court, thus, is certainly entitled to decide *this particular case* adversely to the United States on the ground that the concession undercut the Government's entire argument. But the Court goes much further. It affirmatively endorses the point conceded, thereby embedding in the law the mischievous notion that a defendant is entitled to the protection of the Speedy Trial Clause even though he has suffered none of the harms against which the Clause protects, as long as the government's conduct is sufficiently culpable. I would disregard the concession, for much the same reasons that we sometimes consider an argument that a litigant has waived. See, *e. g., Arcadia* v. *Ohio Power Co.*, 498 U. S. 73, 77 (1990); *Kamen* v. *Kemper Financial Services, Inc.*, 500 U. S. 90, 99–100 (1991); *United States* v. *Burke*, 504 U. S. 229, 246 (1992) (SCALIA, J., concurring in judgment). I see little sense in elevating an unwise concession into unwise law.

tice § 316, p. 209 (8th ed. 1880) ("While . . . courts look with disfavor on prosecutions that have been unduly delayed, there is, at common law, no absolute limitation which prevents the prosecution of offences after a specified time has arrived") (footnote omitted); 1 H. Wood, Limitation of Actions § 28, p. 117 (4th ed. 1916) ("At common law there is no limitation to criminal proceedings by indictment").

That is not to deny that our legal system has long recognized the value of repose, both to the individual and to society. But that recognition finds expression not in the sweeping commands of the Constitution, or in the common law, but in any number of specific statutes of limitations enacted by the federal and state legislatures. Such statutes not only protect a·defendant from prejudice to his defense (as discussed above), but also balance his interest in repose against society's interest in the apprehension and punishment of criminals. Cf. *Toussie* v. *United States,* 397 U. S. 112, 114–115 (1970). In general, the graver the offense, the longer the limitations period; indeed, many serious offenses, such as murder, typically· carry no limitations period at all. See, *e. g.,* Note, The Statute of Limitations in Criminal Law: A Penetrable Barrier to Prosecution, 102 U. Pa. L. Rev. 630, 652–653 (1954) (comparing state statutes of limitations for various crimes); Uelmen, Making Sense out of the California Criminal Statute of Limitations, 15 Pac. L. J. 35, 76–79 (1983) (same). These statutes refute the notion that our society ever has recognized any general right of criminals to repose.

Doggett, however, asks us to hold that a defendant's interest in repose is a value independently protected by the Speedy Trial Clause. He emphasizes that at the time of his arrest he was "leading a normal, productive and law-abiding life," and that his "arrest and prosecution at this late date interrupted his life as a productive member of society and forced him to answer for actions taken in the distant past." Supplemental Brief for Petitioner on Reargument 2. However uplifting this tale of personal redemption, our task is to

illuminate the protections of the Speedy Trial Clause, not to take the measure of one man's life.

There is no basis for concluding that the disruption of an accused's life years after the commission of his alleged crime is an evil independently protected by the Speedy Trial Clause. Such disruption occurs *regardless* of whether the individual is under indictment during the period of delay. Thus, had Doggett been indicted shortly before his 1988 arrest rather than shortly after his 1980 crime, his repose would have been equally shattered—but he would not have even a colorable speedy trial claim. To recognize a constitutional right to repose is to recognize a right to be tried speedily *after the offense.* That would, of course, convert the Speedy Trial Clause into a constitutional statute of limitations—a result with no basis in the text or history of the Clause or in our precedents.

## II

Our constitutional law has become ever more complex in recent decades. That is, in itself, a regrettable development, for the law draws force from the clarity of its command and the certainty of its application. As the complexity of legal doctrines increases, moreover, so too does the danger that their foundational principles will become obscured. I fear that danger has been realized here. So engrossed is the Court in applying the multifactor balancing test set forth in *Barker* that it loses sight of the nature and purpose of the speedy trial guarantee set forth in the Sixth Amendment. The Court's error, in my view, lies not so much in its particular application of the *Barker* test to the facts of this case, but more fundamentally in its failure to recognize that the speedy trial guarantee cannot be violated—and thus *Barker* does not apply at all—when an accused is *entirely unaware* of a pending indictment against him.

I do not mean to question *Barker*'s approach, but merely its scope. We have long recognized that whether an accused

has been denied his right to a speedy trial "depends upon circumstances." *Beavers* v. *Haubert,* 198 U. S. 77, 87 (1905). By setting forth a number of relevant factors, *Barker* provided this contextual inquiry with at least a modicum of structure. But *Barker's* factors now appear to have taken on a life of their own. Instead of simply guiding the inquiry whether an individual *who has been deprived of a liberty protected by the Clause* is entitled to relief, *Barker* has become a source for new liberties under the Clause. In my view, application of *Barker* presupposes that an accused has been subjected to the evils against which the Speedy Trial Clause is directed—and, as I have explained, neither pretrial delay nor the disruption of life is itself such an evil.[5]

Today's opinion, I fear, will transform the courts of the land into boards of law enforcement supervision. For the Court compels dismissal of the charges against Doggett not because he was harmed in any way by the delay between his indictment and arrest,[6] but simply because the Government's efforts to catch him are found wanting. Indeed, the Court expressly concedes that "if the Government had pursued Doggett with reasonable diligence from his indictment to his arrest, his speedy trial claim would fail." *Ante,* at 656. Our function, however, is not to slap the Government on the wrist

---

[5] To recognize that neither of these considerations provides an independent ground for speedy trial relief, of course, is not to say that neither of them is *relevant* to speedy trial analysis. Both may be appropriate considerations in the highly contextual inquiry whether a defendant who *has* been deprived of a liberty protected by the Clause is entitled to relief. See *Barker,* 407 U. S., at 530–533.

[6] It is quite likely, in fact, that the delay *benefited* Doggett. At the time of his arrest, he had been living an apparently normal, law-abiding life for some five years—a point not lost on the District Court Judge, who, instead of imposing a prison term, sentenced him to three years' probation and a $1,000 fine. App. 114–115. Thus, the delay gave Doggett the opportunity to prove what most defendants can only promise: that he no longer posed a threat to society. There can be little doubt that, had he been tried immediately after his cocaine-importation activities, he would have received a harsher sentence.

for sloppy work or misplaced priorities, but to protect the legal rights of those individuals harmed thereby. By divorcing the Speedy Trial Clause from all considerations of prejudice to an accused, the Court positively invites the Nation's judges to indulge in ad hoc and result-driven second-guessing of the government's investigatory efforts. Our Constitution neither contemplates nor tolerates such a role. I respectfully dissent.