**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 16 1999**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

BOBBY WAYNE ANDERSON,

Defendant-Appellant.

No. 98-1256
(D.C. No. 93-CR-296-D)
(D. Colo.)

**ORDER AND JUDGMENT** *

Before **PORFILIO** , **McKAY** , and **LUCERO** , Circuit Judges.

Bobby Wayne Anderson entered a conditional plea of guilty pursuant to

Fed. R. Crim. P. 11(a)(2) to one count of distribution of more than fifty grams of

cocaine base, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(iii). On appeal,

he challenges the district court's denial of his motion to dismiss the indictment

---

* This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

based upon an alleged violation of his Sixth Amendment right to a speedy trial. [2]

We exercise jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

I.

Anderson was arrested after he sold four ounces of crack cocaine to an undercover agent of the Federal Bureau of Investigation (FBI) on June 25, 1992. FBI agents transported Anderson to their Denver headquarters where they took his fingerprints, photographed him, and obtained background information from him. This background information included his parents' names and telephone numbers, the name of a girlfriend, and the name, address and telephone number of Marlene Willis, the mother of his child. The agents released Anderson and continued their investigation.

On September 9, 1993, a federal grand jury returned an indictment charging Anderson with five drug-related counts. Shortly before the indictment was issued, FBI Agent Carle Schlaff contacted the Arapahoe County, Colorado Probation Department for help in locating Anderson. He knew that Anderson was on probation on an unrelated 1992 state charge. Schlaff learned that Anderson

---

[2] After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. See Fed. R. App. P. 34(f) and 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

had violated his probation, had disappeared, and that a warrant had been issued for his arrest.

After the indictment was issued, Schlaff made further efforts to locate Anderson. He posted Anderson's photograph in the <u>Rocky Mountain News</u> and with the Fugitive Task Force in Denver. He sent a lead packet with a photograph and biographical information to the FBI office in Los Angeles, where Anderson's family resided.

The Los Angeles office could not supply Schlaff with any leads in California, but in March 1994 they supplied him with a last-known Denver address for Anderson. Schlaff interviewed Anderson's landlord at that address. The landlord told him that Anderson had moved out in September 1993 owing rent and without leaving a forwarding address.

Other attempts were made by the FBI to locate Anderson. In late 1993 or early 1994, an FBI agent named Diane Spindell telephoned Lillie Anderson, Bobby Wayne Anderson's mother, and left a message on her answering machine. In the message, Spindell told Ms. Anderson that her son should contact her or someone with the FBI. [3] Ms. Anderson testified that she told Anderson about the

---

[3] The FBI agents did not tell Anderson's mother that he had been indicted or that they wanted to arrest him. As Agent Schlaff explained, such a message is unlikely to gain a fugitive's trust or lead to his apprehension. Indeed, the agents might have been justified in failing to contact Anderson's parents at all. <u>See</u>
(continued...)

message. Anderson replied that he had been in some trouble but that the FBI had released him. Ms. Anderson called the FBI back and left a message on their answering machine, but they did not attempt to contact her again.

The FBI also called Anderson's father at work. His father told Anderson about the phone call he had received. Anderson's father tried to call the FBI back but could not get through to them. There is no evidence the FBI attempted to reach Anderson's father again.

In May 1994, Schlaff received a telephone call from a detective in San Diego. The detective was following up on a vandalism complaint involving Anderson, and he had noticed two outstanding warrants for Anderson in his computer. Schlaff sent the detective a packet concerning Anderson, including a photograph.

The detective provided information to Agent Ken Saito of the FBI's San Diego office concerning the vandalism incident. Saito had reason to believe that Anderson might be living with Willis. On May 18, 1994, he traveled to Willis's home and interviewed her.

Anderson was not there, and Willis initially denied all knowledge of him.

---

[3](...continued)
United States v. Walker, 92 F.3d 714, 718 (8th Cir. 1996).

Saito advised Willis that there was an arrest warrant for Anderson and that harboring a federal fugitive was a potential felony. Willis then admitted that she knew Anderson and that he was the father of one of her children. Saito impressed upon Willis the importance of her relaying to Anderson the fact that he was wanted and that he should contact the FBI so that he could be arrested.

By June 1994, Schlaff believed he had reached a dead end in his attempts to locate Anderson. There is no evidence anything further was done to apprehend Anderson for the next three years.

Then, in October 1997, the San Diego FBI office notified Schlaff that it had a lead on Anderson. Agent Greg Houska of the San Diego FBI had received confidential information at that time concerning Anderson and he began surveilling Marlene Willis's apartment in San Diego. A week later, the San Diego office notified Schlaff that they had arrested Anderson.

Anderson testified at the speedy trial hearing. He admitted that he had failed to contact his probation officer before he left Denver and that he had left town owing money to his landlord and without leaving a forwarding address. He stated that during his time in San Diego, he had lived under his own name and had been employed. He stated that he did not know that a federal indictment had been issued against him or that there was a warrant for his arrest. He maintained that Ms. Willis never told him that she had been visited by FBI agents. He admitted

that his mother told him about being called by the FBI, but he stated that she did not tell him he needed to contact the FBI. He admitted also that his father told him he was contacted by the FBI, but he claimed that his father did not tell him that the FBI call was in reference to him.

II.

We review de novo whether Anderson's speedy trial rights were violated. See United States v. Lugo, 170 F.3d 996, 1000 (10th Cir. 1999). We accept the district court's factual findings unless they are clearly erroneous. See id.

Anderson's claim is analyzed under the four-factor balancing test detailed in Barker v. Wingo, 407 U.S. 514 (1972). Under that analysis, we must balance the length of the delay, the reason for the delay, whether the defendant asserted his right to a speedy trial, and the prejudice to the defendant. See id. at 530. No single factor is necessary or sufficient to find a deprivation of the defendant's Sixth Amendment right. See id. at 533. Rather, "they are related factors and must be considered together with such other circumstances as may be relevant." Id.

The first factor, the length of the delay, acts as a triggering mechanism for the analysis. See id. at 530. Unless there is a presumptively prejudicial delay, we need not inquire into the other factors. See id. A delay of more than one year between indictment and the start of trial is sufficient to trigger judicial

-6-

examination of a speedy trial claim. See Doggett v. United States, 505 U.S. 647, 652 n.1 (1992); United States v. Gomez, 67 F.3d 1515, 1521 (10th Cir. 1995). The delay between Anderson's indictment in September 1993 and the date of his arrest exceeded four years. We therefore proceed to consideration of the other Barker factors.

The second factor to be considered is the reason for the delay. The government has the burden of explaining its delay in bringing a defendant to trial. See United States v. Brown, 169 F.3d 344, 349 (6th Cir. 1999); cf. Barker, 407 U.S. at 530 (characterizing second factor as the "reason the government assigns to justify the delay.") The government points to evidence that Anderson left the state of Colorado in September 1993 without notifying his probation officer, paying his rent or leaving a forwarding address. It claims it searched diligently for him, but by June 1994 it had simply exhausted its leads for finding him.

The district court inferred that after her visit from Agent Saito, Marlene Willis told Anderson that he was a federal fugitive and wanted by the FBI. This inference is supported by the evidence. Anderson started living with Willis, at the latest, in late 1994 or early 1995 and they cohabitated until the date of his arrest. It is reasonable to assume that Anderson became aware of his fugitive status and the warrant for his arrest long before he was actually arrested. Cf. United States v. Walker, 92 F.3d 714, 719 (8th Cir. 1996) (permitting inference

that defendant "acquired knowledge of the federal charges [against him] while confined in the Los Angeles County Jail after his jailers were informed of [defendant's] federal charges.") Anderson made no effort to contact the FBI, and remained a fugitive.

Although the government must make some effort to locate a fugitive defendant and bring him to trial, the effort need only be reasonable, not heroic. See United States v. Sandoval, 990 F.2d 481, 485 (9th Cir. 1993). Where the government's failure to locate the defendant results from his own flight from justice or deliberate disappearance, the delay is properly attributed to the defendant. See United States v. Bagster, 915 F.2d 607, 611 (10th Cir. 1990).

The district court determined on these facts that the government was not negligent in failing to locate Anderson prior to October 1997. We accord considerable deference to this finding. See Doggett, 505 U.S. at 652; Walker, 92 F.3d at 718. Although the government's conduct in this case after June 1994 was somewhat lethargic, cf. Doggett, 505 U.S. at 652-53, a careful review of the record convinces us that Anderson's evasive conduct outweighs any negligence on the part of the government.[1]

_____

[1] Anderson analogizes his situation to that of the defendant in Doggett, whose speedy trial rights were violated when he lived openly in the United States for six years while the government clung to a questionable assumption that he was living abroad. See 505 U.S. at 649, 652-53. He fails to show, however, that the

(continued...)

Even if Anderson's evasive conduct does not outweigh any government negligence, however, his speedy trial claim clearly founders on *Barker*'s third criterion: his assertion of his right to speedy trial. When a defendant knows of his indictment long before his arrest, but fails to take action to obtain a speedy trial, the third factor weighs heavily against him. See *Doggett*, 505 U.S. at 653. Anderson may have been unaware that he had been indicted until his arrest. He did know, however, that he was a federal fugitive. He preferred to remain a fugitive than to be arrested, to face any charges filed against him, and to assert his right to a speedy trial. See *Barker*, 407 U.S. at 536 ("[W]e would be reluctant indeed to rule that a defendant was denied this constitutional right on a record that strongly indicates . . . that the defendant did not want a speedy trial.") The third factor therefore weighs heavily against him.

The final factor of the *Barker* test is whether the defendant was prejudiced by the delay. Anderson presented no specific evidence of prejudice. Instead, he chose to rely on the presumption of prejudice created by the delay.

In *Doggett*, the Supreme Court identified three principal types of harm arising from the delay between formal accusation and trial. These are "oppressive pretrial incarceration," "anxiety and concern of the accused," and "the possibility

---

[1](...continued)
government "could have found him within minutes" as it did Doggett. See *id.* at 653.

that the accused's defense will be impaired by dimming memories and loss of exculpatory evidence." Doggett, 505 U.S. at 654 (quotations omitted). The first harm is not present here. To the extent the second type of harm exists, it must be attributed to Anderson's failure to surrender himself. Only the third type of harm is implicated here .

The presumption of prejudice to Anderson's defense created by the length of delay must be carefully weighted against the reason for the delay. See id. at 656-68. Here, Anderson's own conduct, rather than official bad faith or negligence, is responsible for the harm. To say otherwise would reward defendants for knowingly failing to surrender to authorities.

Having considered each of the Barker factors through our de novo analysis, we conclude that Anderson fails to show that his Sixth Amendment right to a speedy trial was violated. The judgment is AFFIRMED.

ENTERED FOR THE COURT


Carlos F. Lucero
Circuit Judge