[No. B236898. Second Dist., Div. Six. Feb. 13, 2014.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSE CARMEN MURILLO GARCIA, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for partial publication. The portions of this opinion to be deleted from publication those portions enclosed within double brackets, [[/]].

**COUNSEL**

Donald R. Tickle, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr., and Rama R. Maline, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**O'DONNELL, J.**[*]—In 2011 a jury convicted Jose Carmen Murillo Garcia of first degree murder with a firearm enhancement in the September 9, 1976 death of Roberto Lozano. The verdict was reached after Garcia's third trial; two previous jury trials ended in mistrials. The trial court sentenced Garcia to life with the possibility of parole plus five years for the firearm enhancement. He appeals, contending that he was denied his rights to a speedy trial, due process, and to confront a key witness against him. Garcia also contends that the trial court improperly denied his motions to dismiss in the interests of justice after his first and second trials and made prejudicial evidentiary rulings and sentencing errors. We correct the sentencing errors and otherwise affirm.

### FACTS AND PROCEDURAL HISTORY

#### The Murder and the Investigation

At approximately 4:00 p.m. on September 9, 1976, Baldwin Park police officers were called to the scene of a homicide on Baldwin Park Boulevard. They found victim Roberto Lozano (Roberto)[1] slumped over dead in the driver's seat of a crashed white 1968 Ford. He had been shot with a .22-caliber firearm. The police found several .22-caliber shell casings in the car. The police investigation revealed that Roberto, Garcia and a third person later identified as Pablo Chavez had been in a bar not far from the scene and that they left the bar together about 3:45 p.m.

The police interviewed Barbara Ornellas, who was standing in her front yard across the street from the site of the crash. Ornellas reported that she saw the white Ford turning onto her street, followed by a green car. The passenger in the white Ford pointed a gun at the driver's head and shot the driver four or five times. The Ford jumped the curb opposite Ornellas's house and crashed into a chain-link fence. The green car stopped in the middle of the street with the engine running. The shooter exited the white Ford with a gun in his hand, walked toward the green car and got into the front passenger seat. The green car made a U-turn and drove off. Ornellas later identified Garcia as the shooter from a six-pack photo display.

Later on the day of the murder, a California Highway Patrol officer found a .22-caliber Beretta pistol next to the 605 Freeway near the junction with

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1] Because several witnesses, as well as the victim, share the name Lozano, we sometimes refer to the Lozanos by their first names for clarity.

Interstate 10. A sheriff's department firearms examiner determined that the shell casings recovered from the white Ford were fired from this Beretta .pistol.

Several witnesses, including Norberto Lozano and Rudolfo Zavala, told police that Garcia drove a 1969 green Pontiac. Zavala testified that he cosigned for Garcia when Garcia purchased the green Pontiac. Following up on tips received from friends of Garcia, the police located the green Pontiac in San Ysidro, California, near the Mexican border, on October 1, 1976.[2] The car was registered to Rudolfo Zavala. It contained an insurance application and an auto body repair order in Garcia's name.

A felony complaint was filed against Garcia on September 17, 1976, and on September 20, 1976, a warrant was issued for his arrest. Law enforcement made no further efforts to find Garcia after October 1976.

Thirty-three years later, on May 5, 2009, Baldwin Park police received a tip from the FBI that Garcia was in Laredo, Texas. He was arrested that day and returned to California. On July 21, 2009, following a preliminary hearing, Garcia was charged by information with the murder of Roberto Lozano.

*Pablo Chavez*

Following Garcia's arrest in 2009, Baldwin Park Police located Pablo Chavez in prison in California. The police interviewed him twice before Garcia's preliminary hearing.

At the preliminary hearing, Chavez testified that he had been at a bar with Garcia and Roberto on September 9, 1976.[3] Garcia and Roberto left the bar together in Roberto's white Ford and Garcia told Chavez to follow them in Garcia's green Pontiac, tossing Chavez the keys. Chavez followed, heard gunshots and saw Roberto's car crash into a fence. Chavez ran to the white Ford and saw Roberto slumped over in the driver's seat, dead and covered with blood. Garcia exited Roberto's car. Chavez asked him, "What did you do?" and Garcia responded, "Let's split for San Ysidro." Garcia and Chavez then got into the green Pontiac and Garcia repeated the order to "Go ahead and go to San Ysidro." Chavez drove to San Ysidro as instructed. En route, while they were driving on the 605 Freeway near the junction of the I-10 Freeway, Garcia threw something that looked "like a gun" out of the car.

---

[2] San Ysidro is a district in the south of San Diego, immediately north of the United States-Mexico border, where Interstate 5 and a pedestrian walkway cross into Tijuana.

[3] At trial Chavez testified that Garcia told him while they were at the bar that Roberto had sexually molested Garcia's wife.

Chavez continued driving to San Ysidro, where he and Garcia left the green Pontiac in a parking lot. Garcia and Chavez then walked across the border into Tijuana, where they separated. Chavez had no further contact with Garcia. Chavez returned to California several months later.

[[/]]*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

[[*The Three Trials*]]*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*DISCUSSION*

I. *Speedy Trial*

■ Garcia contends that the 33-year delay between the filing of the criminal complaint and his arrest violated his state right to a speedy trial and his state and federal rights to due process. The California Constitution guarantees a criminal defendant's right to a speedy trial. (Cal. Const., art. I, § 15.) Under both state and federal law, due process of law also bars prejudicial delay in bringing a defendant to trial. (*People v. Martinez* (2000) 22 Cal.4th 750, 754 [94 Cal.Rptr.2d 381, 996 P.2d 32]; *Doggett v. United States* (1992) 505 U.S. 647, 655, fn. 2 [120 L.Ed.2d 520, 112 S.Ct. 2686].) Both rights are triggered by the filing of a criminal complaint. (*People v. Martinez, supra*, at p. 754.)[4] To prevail on either speedy trial or due process grounds, the defendant must first show prejudice caused by the delay, whereupon the burden shifts to the prosecution to justify the delay. The court then balances the harm against the justification. (*Jones v. Superior Court* (1970) 3 Cal.3d 734, 741 [91 Cal.Rptr. 578, 478 P.2d 10].) We uphold the trial court's ruling or decision on appeal if it is supported by substantial evidence. (*People v. Mitchell* (1972) 8 Cal.3d 164, 167 [104 Cal.Rptr. 348, 501 P.2d 916].)

A. *Waiver of Right to Speedy Trial*

■ The People urge us to bypass this balancing test and to find instead that Garcia forfeited his right to a speedy trial by fleeing California to avoid

---

*See footnote, *ante*, page 1173.

[4] Garcia does not assert his speedy trial right under the Sixth Amendment to the United States Constitution, which is not triggered until either arrest or the filing of an indictment or information. (*People v. Martinez, supra*, 22 Cal.4th at pp. 754–755.)

prosecution. (*People v. Perez* (1991) 229 Cal.App.3d 302 [279 Cal.Rptr. 915].) We agree. "[A] defendant who flees the jurisdiction of a court for the purpose of avoiding prosecution waives the right to a speedy trial. [Fn. omitted.]" (*Id.* at p. 308.) The balancing test described above "does not come into play when the defendant has fled the jurisdiction for the purpose of avoiding prosecution. . . . [T]he fugitive, having done all he or she can do to avoid being brought to justice, cannot then claim that denial of the right to speedy trial resulted from the ensuing delay." (*Id.* at p. 314.)

In *Perez*, the defendant was indicted in 1978 for murder in California. He was not aware of the indictment. A week later, he was arrested on federal drug charges in Puerto Rico. At a bail hearing on the drug charges, the federal agent who arrested the defendant informed the court, in the defendant's presence, " 'that there were charges to be filed, very serious charges, by the State of California,' " against the defendant. (*People v. Perez, supra*, 229 Cal.App.3d at pp. 305–306.) The defendant was released on his own recognizance and disappeared. Eight years later he was located in Venezuela, was arrested and returned to California. At the hearing on the defendant's speedy trial motion, a federal agent testified that he had interviewed the defendant in Venezuela after his arrest and the defendant informed him " 'that he didn't want to come to the United States because he had killed two people in California . . . and he was afraid he was going to be prosecuted on that.' " (*Id.* at p. 307.) The court held that "a defendant who flees the jurisdiction of a court for the purpose of avoiding prosecution waives the right to a speedy trial. [Fn. omitted.]" (*Id.* at p. 308.)

 The waiver of the right to a speedy trial, like all waivers, must be knowing: a defendant who leaves the court's jurisdiction not knowing charges are pending does not thereby waive the right to a speedy trial. (*People v. Perez, supra*, 229 Cal.App.3d at p. 308, fn. 4; see *Doggett v. United States, supra*, 505 U.S. at p. 653 [no forfeiture of speedy trial right found where defendant did not know of the charges against him until his arrest].) Garcia contends that he did not waive his right to a speedy trial because he did not know charges were pending against him until he was arrested in 2009. The People presented substantial evidence, however, that Garcia was aware that he was subject to prosecution for Roberto's murder when he fled to Mexico. At Garcia's preliminary hearing Chavez testified that when he saw Roberto dead and covered with blood in the white car, he asked Garcia, "What did you do?" Garcia responded by ordering Chavez, "Let's split for San Ysidro." After Garcia and Chavez got into the green car Garcia repeated the instruction: "Go ahead and go to San Ysidro." Chavez did as he was told and drove Garcia to the Mexican border at San Ysidro, where they walked across the border together. Along the way Garcia discarded what "looked like" a gun.

This testimony was substantial evidence that Garcia fled the jurisdiction to avoid prosecution for Roberto's murder and compels the reasonable inference that he did so.

It does not matter that charges had not been filed against Garcia when he fled. As the court explained in *Perez*, "[i]t does not matter that defendant had not been informed of the exact nature of the charges . . . before he fled to Venezuela" because he had been informed the day before he fled that " 'serious charges' " against him were pending in California. (*People v. Perez, supra*, 229 Cal.App.3d at p. 309.) Perez's admission that he had killed two people in California and was afraid he would be prosecuted for them "demonstrates defendant was aware of the nature of the charges and actively sought to avoid prosecution." (*Ibid.*)

■ Garcia's instructions to Chavez to drive him to the border immediately after the killing demonstrate his knowledge that he would be prosecuted for Roberto's murder and "actively sought to avoid" that eventuality. Although Garcia argues that Chavez was an unreliable witness, the trial court credited his testimony concerning Garcia's flight. Chavez's testimony was also corroborated by the evidence that Garcia's car was found in San Ysidro where Chavez said he left it and by the California Highway Patrol's recovery of a firearm where Chavez testified Garcia discarded what looked "like a gun." Substantial evidence demonstrates that Garcia fled California to avoid prosecution for Roberto's murder.[5]

[[B. *Evidentiary Hearing*]]*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

[[II.–IV.]]*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## V. *Sentencing Errors*

Garcia asserts, and the People acknowledge, that the trial court made three sentencing errors. We agree and modify those errors as shown below.

---

[5] Although the trial court did not expressly find that Garcia waived his speedy trial right by fleeing to avoid prosecution, its denial of Garcia's speedy trial motion was correct on that theory for the reasons explained in the text. We sustain the trial court's ruling " ' "regardless of the considerations which may have moved the trial court to its conclusion." ' " (*In re Pickett* (1972) 25 Cal.App.3d 1158, 1163 [102 Cal.Rptr. 487].)

* See footnote, *ante*, page 1173.

## *DISPOSITION*

(1) The $200 parole revocation fee is stricken; (2) the sentence of life without the possibility of parole is amended to life in prison to reflect the oral pronouncement of sentence (*People v. Mitchell* (2001) 26 Cal.4th 181, 185 [109 Cal.Rptr.2d 303, 26 P.3d 1040]); and (3) Garcia's custody credits are amended to 897 days, including the date of arrest and the date of sentencing.

We direct the superior court to prepare an amended abstract of judgment accordingly, and to send a certified copy to the Department of Corrections and Rehabilitation. As modified, the judgment is affirmed.

Yegan, Acting P. J., and Perren, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 11, 2014, S217401.