Defendant David Campbell appeals his conviction of four counts of assault, with five specifications, rendered by the Common Pleas Court of Lorain County. We affirm.
 I
Defendant was indicted on November 29, 1995, on four counts of assault, in violation of R.C. 2903.13(A), with five specifications. The charges stemmed from incidents occurring on August 17, 1995, at the Grafton Correctional Institution ("GCI"), where defendant was an inmate. Officers Mark Hans and Jose Hilbert, Captain Jeff Brlas, and Lieutenant Billy Michaels, all employees of the Ohio Department of Rehabilitation and Correction assigned to GCI, were injured as they tried to escort defendant and another inmate from the recreation yard to isolation. Defendant was not served with the indictment until February 4, 1997, over fourteen months after it was issued. He pleaded not guilty to all charges.
On March 18, 1997, defendant moved to dismiss the charges against him on the grounds that the state had failed to provide him with a speedy trial. The delay of which he complained was the more than fourteen-month period between issuance of the indictment and its service upon him. Defendant claimed, without specificity, that the delay had precluded him from the opportunity to interview witnesses who may have been present at the time of the alleged assaults, that the witnesses' memories would not be as clear as they would have been had he been timely served, and that the identities of various inmates and corrections officers who might have witnessed the assaults would be more difficult to ascertain given the length of the delay. Following a hearing, the trial court denied the motion, finding that defendant had not proven any affirmative damage or prejudice.
Defendant was tried to a jury, which found him guilty on all counts. He filed a timely notice of appeal and asserts two assignments of error.
 II A
In his first assignment of error, defendant argues that the trial court erroneously failed to dismiss the charges against him despite the fact that he was denied a speedy trial. He bases his argument on both constitutional and statutory grounds: (1) that he was denied the right to a speedy trial guaranteed by theSixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution; and (2) that, in accordance with R.C. 2945.71, the state had a duty to use reasonable diligence in attempting to locate and notify him of the charges pending against him.
The Sixth and Fourteenth Amendments to the United States Constitution and Section 10, Article I of the Ohio Constitution, guarantee a criminal defendant the right to a speedy trial. Statev. Brown (1992), 64 Ohio St.3d 476, 478-479. That right is not limited in scope to the period following formal arrest but extends to any delay between indictment and arrest. Doggett v.United States (1992), 505 U.S. 647, 648, 120 L.Ed.2d 520, 526. In considering whether the time between indictment and arrest violates an accused's right to a speedy trial, a court must employ a two-pronged analysis. First, it must determine whether the accused has alleged that the interval between accusation and trial "crossed the threshold dividing ordinary from `presumptively prejudicial' delay." Id., 505 U.S. at 651-652,120 L.Ed.2d at 528. The Supreme Court has noted, without approving or disapproving, that some states have construed a one-year delay as meeting the first prong of the analysis. Id., 505 U.S. at 652,120 L.Ed.2d at 528, fn.1. This court has "assume[d] without deciding" that a delay of just under one year between indictment and service meets the first prong of the Doggett analysis. Statev. Auterbridge (Feb. 25, 1998), Lorain App. No. 97CA006702, unreported, at 4. Accordingly, in this case we assume that defendant has met the first threshold of the Doggett analysis by alleging that the fourteen-month delay between indictment and service was presumptively prejudicial.
Once the accused makes a showing of presumptive prejudice, the second prong of the speedy trial analysis must be considered; that is, the four-factor balancing test set out in Barker v. Wingo
(1972), 407 U.S. 514, 530, 33 L.Ed.2d 101, 116-177. Doggett,505 U.S. at 651-658, 120 L.Ed.2d at 528-532. The four factors that must be balanced are the "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." Barker, 407 U.S. at 530, 33 L.Ed.2d at 116-117.
The length of the delay and the reason for the delay are closely related. Id. at 530-531, 33 L.Ed.2d at 117. A seventeen-month delay in the context of a "relatively simple prosecution where the state was able to rely solely on evidence to which it had access at the time of the indictment" and where the defendant did not cause the delay is "unnecessarily long." Statev. Grant (1995), 103 Ohio App.3d 28, 34. However, mere negligence on the part of the state, in the absence of a "deliberate attempt to delay the trial in order to hamper the defense," does not weigh "heavily" against the state. See Barker, 407 U.S. at 531,33 L.Ed.2d at 117. Thus, even a significant delay of fifty-four months has been found to carry negligible weight where a defendant's liberty has not been impacted, where a defendant is unaware of the charges, and where the "interests which theSixth Amendment was designed to protect — freedom from extended pretrial incarceration and from the disruption caused by unresolved charges — " are not at issue. State v. Triplett
(1997), 78 Ohio St.3d 566, 569. In the case before us, a fourteen-month delay caused, as the state concedes, by "a lack of diligence on behalf of the Lorain County Sheriff's Department to serve the defendant" is long. However, the weight of these two factors is negligible because defendant was incarcerated on other charges throughout the entire period and was unaware that additional charges were pending against him.
With respect to the third Barker factor, assertion of the right to a speedy trial, defendant asserted his right six weeks after service of the indictment. Although this factor weighs in defendant's favor, it is to be accorded only moderate weight. SeeTriplett, 78 Ohio St.3d at 570.
The fourth Barker factor is prejudice to the defendant.
 Prejudice * * * should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired.
Barker, 407 U.S. at 532, 33 L.Ed.2d at 118. The only prejudicial interest asserted by defendant in this case is the third, impairment of his defense. Impairment may be found where witnesses have died or disappeared or the length of time has resulted in witnesses being unable to accurately recall the events of the distant past. Id., 407 U.S. at 534, 33 L.Ed.2d at 119. Impairment may also be found when a defendant is prevented from defending himself because evidence that might have been used in his defense has been destroyed. State v. Grant,103 Ohio App.3d at 36. When actual prejudice is demonstrated by the death of two witnesses, the unavailability of a third witness, and the loss of police records, the fourth Barker factor weighs heavily in favor of the defendant. See Dickey v. Florida (1970), 398 U.S. 30, 38,26 L.Ed.2d 26, 32. However, the state may rebut a presumption of prejudice when a defendant's defense is "not dependent upon exculpatory evidence that might be lost or thrown away or the testimony of witnesses whose memories might fade with time." (Emphasis added.) United States v. Mundt (C.A.6, 1994),29 F.3d 233, 237. See, also, State v. Worthy (July 16, 1997), Lorain App. No. 96CA006576, unreported, at 6 (loss of possible witnesses over a thirteen-month delay falls well short of establishing prejudice).
In this case, defendant only generally alleged that the fourteen-month delay precluded him from the opportunity to interview witnesses who may have been present at the time of the alleged incidents, that the witnesses' memories would not be as clear as they would have been had he been timely served, and that the identities of various inmates and corrections officers who might have witnessed the incidents would be more difficult to ascertain. As in Worthy, defendant's general assertions fall far short of the actual loss of evidence established in Grant.
Viewing the four Barker factors together in this case, even though the length of the delay, the reason for the delay, and assertion of his speedy trial right are in defendant's favor, they carry minimal weight; and defendant's general assertions of lost or impaired evidence fail to establish prejudice to his defense. All of the victims in this case testified at trial and were cross-examined by defense counsel; and defendant presented the testimony of six witnesses, none of whom demonstrated any loss of memory regarding the events. Accordingly, the fourteen-month delay at issue in this case does not rise to a level of prejudice sufficient to establish that defendant was denied his right to a speedy trial.
As to defendant's assertion that R.C. 2945.71 creates a duty on the part of the state to use reasonable diligence in attempting to locate and notify an accused of charges pending against him, that statute merely sets forth the time periods within which an accused must be brought to trial "after his arrest or service of summons" in order to preserve his right to a speedy trial. Nothing in R.C. 2945.71 creates a statutory duty on the part of the state to use reasonable diligence in serving a defendant with an indictment. State v. Martin (1984), 16 Ohio App.3d 172, 173, on which defendant relies, holds only that the state cannot avoid dismissal on speedy trial grounds by relying on an imprisoned defendant's failure to give notice of the place of his imprisonment as required by R.C. 2941.401 if the state has not exercised reasonable diligence in attempting to locate the defendant.
Defendant's first assignment of error is overruled.
 B
Defendant's second assignment of error is that he was denied the effective assistance of trial counsel when counsel failed to request an instruction on self-defense. He specifically argues that, in the case of one of the victims, Lieutenant Michaels, he was merely defending fellow inmate John Harvey from Lieutenant Michaels' assault. He also argues that it was plain error for the trial court to fail to give a jury instruction on self-defense, even in the absence of a request by defense counsel.
 1 A two-step process is employed in determining whether the right to effective counsel has been violated.
 First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.
Strickland v. Washington (1984), 466 U.S. 668, 687,80 L.Ed.2d 674, 693. A strong presumption exists that licensed attorneys are competent and that the challenged action is the product of a sound strategy. Id., 466 U.S. at 689, 80 L.Ed.2d at 694-695. "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." Id., 466 U.S. at 691, 80 L.Ed.2d at 695.
Even if a defendant demonstrates under the first part of theStrickland test that counsel erred, that error "even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." Id., 466 U.S. at 691, 80 L.Ed.2d at 696. Under the second part of the Strickland test, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id., 466 U.S. at 694, 80 L.Ed.2d at 698.
Under Ohio law, in order to establish self-defense, the defendant must show (1) that he was not at fault in creating the situation giving rise to the affray; (2) that he had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of force; and (3) that he did not violate any duty to retreat or avoid the danger. State v. Williford (1990), 49 Ohio St.3d 247,249. "If the defendant fails to prove any one of these elements by a preponderance of the evidence he has failed to demonstrate that he acted in self-defense." (Emphasis sic.)State v. Jackson (1986), 22 Ohio St.3d 281, 284, certiorari denied (1987) 480 U.S. 917, 94 L.Ed.2d 686.
A person who asserts that he was defending another and "intervenes in a struggle and has no duty to do so, acts at his own peril if the person assisted was in the wrong." State v.Wenger (1979), 58 Ohio St.2d 336, 339. The intervenor "stands in the shoes of the person whom he is aiding, and if the person aided is the one at fault, then the intervenor is not justified in his use of force and is guilty of an assault." Id. at 340.
Each of the four corrections officers alleged to have been assaulted by defendant, as well as an investigator for GCI and an investigator for the Ohio State Highway Patrol, testified for the state at trial. Defendant and five other GCI inmates who were either involved in the incidents, or claimed to have witnessed them, testified for the defense. The testimony established that, on the evening of August 17, 1995, an inmate named Linville was assaulted. Linville identified defendant and another inmate, John Harvey, as his assailants.
The duty officer dispatched Lieutenant Michaels and Officer Hans to locate defendant and Harvey and lock them in isolation cells for investigation of the Linville matter. According to GCI rules, in such situations corrections officers are to remove the inmates involved in an altercation and place them in isolation, using the least amount of force necessary for compliance. None of the GCI officers involved carry weapons.
Lieutenant Michaels reached the recreation yard first, located defendant and Harvey, cuffed them, and began leading them to isolation. Officers Hans then arrived. Testimony differed as to what happened next. According to Officer Hans, Harvey aggressively moved toward Lieutenant Michaels, calling him a "punk-ass bitch," or "punk-ass mother fucking bitch," and Officer Hans grabbed Harvey by the arm and steered him to the ground. According to Lieutenant Michaels, he thought defendant was resisting Officer Hans and saw the two going down to the ground. Lieutenant Michaels then grabbed Harvey by the arm, put him on the ground, and straddled him. Both officers deny hitting or choking Harvey. According to Lieutenant Michaels, as he straddled Harvey and attempted to keep Harvey from biting him, defendant kicked him in the face, injuring his mouth and lip. According to Officer Hans, defendant also kicked him in the face and slid to the ground. Officer Hans then jumped on top of defendant to restrain him, and defendant began spitting at him. When a third officer, Captain Brlas, approached, defendant kicked him in the face, causing Captain Brlas to fall and hit his head on the concrete, resulting in a concussion. Defendant then kicked himself up, spun around, and kicked Officer Hans in the face again. A fourth officer, Officer Hilbert, was able to subdue defendant, as other inmates began throwing rocks at the officers. As defendant lay on the ground, Officer Hilbert felt a sharp pain in his leg and looked down to find defendant biting his leg. According to Officer Hilbert, both defendant and Harvey screamed for the other inmates to attack the officers. The officers then steered defendant back to where Lieutenant Michaels and Harvey were. Defendant told Harvey, "It's all over. It's all over" and kicked Lieutenant Michaels in the face. At this point, Officer Hans and Lieutenant Michaels were both bleeding, and Officers Hans' nose and ankle were broken.
According to the investigators who interviewed defendant following the incidents, defendant admitted that he kicked Lieutenant Michaels and Captain Brlas. Defendant also admitted "mugging" or pushing Linville earlier in the evening and that Harvey was with him. Defendant claimed he was not struck by any officers but was knocked to the ground by Officer Hilbert.
John Harvey, who was imprisoned at GCI on a murder conviction, testified that, after being handcuffed by Lieutenant Michaels, he cooperated, but complained several times that the cuffs were too tight. Lieutenant Michaels told Harvey to be quiet. Harvey admitted that, according to prison rules, he should have obeyed Lieutenant Michaels at that point and stopped talking. As they walked, however, Harvey responded to questions from other inmates about why he was being taken to isolation. Lieutenant Michaels again told him to be quiet, lifted the cuffs up, pushed him forward, grabbed him by the neck, and threw him to the grass. According to Harvey, Lieutenant Michaels then got on top of him and began choking him with both hands. Defendant came over and tried to get Lieutenant Michaels to stop by attempting to push him off with his foot. At that point, Officer Hans took defendant to the ground. According to Harvey, he then began shouting for help in getting Lieutenant Michaels off him but never struck, bit, or injured anyone. He testified he did not see Captain Brlas or Officer Hilbert during the incidents.
Defendant, also at GCI on a murder conviction, testified that, before Lieutenant Michaels threw Harvey to the ground, he heard only a verbal altercation between Harvey and Lieutenant Michaels. Defendant claimed that Lieutenant Michaels began choking Harvey, that he asked Lieutenant Michaels to get off Harvey, and that he was in fear for Harvey's life. When Officer Hans told defendant to keep walking, defendant resisted by standing still but did not hit or kick Officer Hans. Defendant claimed he then tried to shove Lieutenant Michaels off Harvey by placing his foot on Lieutenant Michaels' shoulder. After that, defendant claims he was brought to the ground, got up, and was being led again to isolation when he resisted again because Lieutenant Michaels was still choking Harvey. Officer Hilbert then ran at him, hitting him in the neck, and rendering him unconscious. When he regained consciousness, defendant maintains that Officer Hans took him back to Harvey where defendant again tried to shove Lieutenant Michaels off. Defendant denied ever telling any investigators that he had kicked either Lieutenant Michaels or Captain Brlas, despite the fact that he had signed their reports to that effect. Defendant admitted, however, that he might have been kicking his feet while being restrained and that officers in the vicinity might have been kicked. Defendant also admitted that resisting Officer Hans as he was being escorted to isolation was wrong. Defendant did not remember Officer Hans bleeding at any time.
Several other inmates testified to seeing only a verbal altercation, or no altercation at all, between Lieutenant Michaels and Harvey before Lieutenant Michaels took Harvey down, sat on him, and put his forearm across his neck. One described Lieutenant Michaels as having his arm up around Harvey's neck, apparently to restrain and hold him down, while Harvey screamed. Another said defendant merely asked Lieutenant Michaels to let Harvey go and put his foot on Lieutenant Michaels' shoulder to try to push him off. Prior to Officer Hilbert's intervention, one inmate saw defendant kicking in front of Hans to back him up but did not see defendant hit or kick Officer Hans. According to one inmate, when Captain Brlas arrrived, both defendant and Harvey were asking for help. Instead, Officer Hans took defendant to the ground. No inmates observed defendant kicking officers or inflicting any injuries on officers. There were three to five hundred inmates in the yard at the time of the altercation and only a handful of officers, but no inmates saw other inmates throwing rocks.
Throughout much of the trial, defense counsel elicited from defense witnesses testimony that might have been used to establish the affirmative defense of self-defense. However, at the close of all of the testimony, the following colloquy took place between the court and defense counsel:
 [THE COURT:] And just for the record, I know that, Counsel, you've considered and I'm sure discussed with your client the possibility of an instruction of self-defense or defense of another, and it's your trial strategy that you do not wish that instruction; is that correct?
[COUNSEL:] That's correct, your Honor.
In view of the foregoing, it is clear that defense counsel consciously chose not to request an instruction on self-defense. It is also clear from the testimony that the defense employed an alternate strategy at trial; namely, that defendant simply did not assault anyone. Defendant denied that he knowingly delivered any blows, kicks, bites, or assaults of any nature upon the officers. Harvey, and all of the other defense witnesses, supported defendant's position in this regard, and all emphasized that they did not see any injured officers. The elements of the assaults with which defendant was charged require a knowing cause, or attempt to cause, physical harm. R.C. 2903.13(A). It is possible that defense counsel believed that the state simply had not proven its case against defendant beyond a reasonable doubt. It is also possible that counsel believed that an instruction on self-defense would distract the jury from the state's failure to make its case and cause it to focus, instead, on the elements of self-defense and whether defendant had demonstrated self-defense by a preponderance of the evidence. Defendant admitted his participation in the altercation with Linville that set off the chain of events that led to the assaults on the officers. Moreover, defendant admitted that he should simply have walked with Officer Hans to isolation instead of resisting Officer Hans' order to do so. Given defendant's admissions, counsel may have believed that defendant had stymied his effort to show that he was not at fault in creating the situation giving rise to the affray, an element of self-defense. As to defendant's defense of Harvey, there was ample testimony of Harvey's involvement in the Linville matter and that Harvey was resisting efforts by Lieutenant Michaels to remove him to isolation. Unless the inmates' version of events was believed, there would have been no justification in defendant employing force to defend Harvey. In light of the foregoing, this court is unable to conclude that defense counsel's failure to request a self-defense instruction was not the product of sound trial strategy. Accordingly, defendant has failed to establish the first prong of the Strickland test.
Even if defendant had shown his counsel's performance to be deficient for failure to request a self-defense instruction, counsel also failed to establish the second prong of theStrickland test. The state's evidence was contrary to a defense theory of self-defense. Moreover, defendant's own admissions and the defense witnesses' single-minded theme that defendant struck no blows and injured no officers was contrary to the physical evidence. While defendant has raised a possibility that a self-defense instruction could have had an effect on the jurors, he has failed to demonstrate a reasonable probability, as required by Strickland, that an instruction on self-defense would have produced a different trial result.
 2
Defendant also argues that it was plain error on the part of the trial court to fail to give the jury an instruction on self-defense, even in the absence of a request by defense counsel.
The failure of the defense to object or request a jury instruction constitutes waiver of any error unless, but for the error, the outcome of the trial clearly would have been otherwise. See State v. Underwood (1983) 3 Ohio St.3d 12, 14. In view of this court's determination under defendant's ineffective assistance of counsel argument that defendant failed to demonstrate a reasonable probability that a self-defense instruction would have produced a different trial result, defendant's plain error argument also must fail.
Defendant's second assignment of error is overruled.
Judgment affirmed.
 KK
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Lorain County Court of Common Pleas to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).
Costs taxed to appellant.
Exceptions.
 ___________________________ BETH WHITMORE
FOR THE COURT
SLABY, P. J.
BATCHELDER, J.
CONCUR