**UNITED STATES of America**

v.

**Juan David VASQUEZ–URIBE, Appellant.**

**No. 09–3256.**

United States Court of Appeals, Third Circuit.

Submitted Pursuant to Third Circuit LAR 34.1(a) March 11, 2011.

Filed May 4, 2011.

George S. Leone, Esq., Steven G. Sanders, Esq., Office of United States Attorney, Newark, NJ, for United States of America.

Juan David Vasquez–Uribe, Bruceton Mills, WV, pro se.

Before: SCIRICA, AMBRO and VANASKIE, Circuit Judges.

## OPINION OF THE COURT

SCIRICA, Circuit Judge.

After a bench trial, Juan David Vasquez–Uribe was convicted on two counts of conspiracy pertaining to a scheme to import and distribute 300 kilograms of cocaine and was sentenced to two concurrent thirty-year terms of imprisonment. On appeal, Vasquez–Uribe raises three issues. As an initial matter, he challenges the sufficiency of the evidence underlying his conspiracy convictions. In addition, he raises two discrete constitutional claims. The first stems from the seven-year delay between his indictment and his trial, which he alleges violated his right to a speedy trial. The second derives from his trial attorney's failure to call two witnesses who theoretically may have offered exculpatory

testimony, which he alleges derogated his right to effective assistance of counsel. We will affirm.

## I.

In February 2001, the Drug Enforcement Administration (DEA) obtained judicial authorization to intercept conversations transmitted by a cellular telephone being used by Antonio Gil. Shortly after hearing Gil pledge to fax property deeds as "guarantees" for an impending transaction, law enforcement officers began to conduct surveillance of a Bergenfield, New Jersey residence belonging to co-conspirator Johnny Toro. On February 8, at the request of DEA, whose officials had spotted Carla Perez arriving at and departing from Toro's residence, a Fort Lee police officer stopped Perez's vehicle, obtained her consent for a vehicle search, and discovered two large duffel bags containing 95 kilograms of cocaine. Toro testified that Gil then used a payphone to relay the news to Vasquez–Uribe, whom Gil referred to as "el patron" ("the boss") and who reputedly owned the confiscated package.

Gil abandoned his cell phone, and the wiretap resumed when authorities identified his new number. Gil and Vasquez–Uribe then proceeded to engage in a series of intercepted conversations. Over time, Vasquez–Uribe claimed Gil owed him $1.8 million for the seized cocaine, acknowledged he had received the deeds to the Colombian property Gil had pledged as collateral, revealed an additional 205 kilograms had safely entered the United States, and threatened to prevent Gil's wife from leaving Colombia. Vasquez–Uribe visited the properties covered by the transferred deeds and told Gil he would retain Gil's farm until the debt was paid down but had no interest in assuming possession of a less attractive piece of property, which he dismissively dubbed "the small one." With an eye on facilitating repayment, Vasquez–Uribe agreed to give Gil 50 kilograms of cocaine on consignment, but Gil was arrested before the transaction was consummated.

On November 30, 2001, a federal grand jury issued a four-count indictment against Vasquez–Uribe, charging him with: (1) conspiracy to import 300 kilograms of cocaine into the United States from Colombia, in violation of 21 U.S.C. § 963; (2) importation of 300 kilograms of cocaine into the United States from Colombia, in violation of 21 U.S.C. §§ 952, 960(a)(1) and 960(b)(1) and 18 U.S.C. § 2; (3) conspiracy to distribute and possess with intent to distribute 300 kilograms of cocaine, in violation of 21 U.S.C. § 846; and (4) distribution and possession with intent to distribute 300 kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A) and 18 U.S.C. § 2.

At the time the indictment was issued, Vasquez–Uribe's whereabouts were a mystery to American law enforcement. DEA New Jersey sent a request to the International Criminal Police Organization (Interpol) for the issuance of a "Red Notice" to alert all member countries that the United States had issued an arrest warrant and was committed to pursuing extradition. In the course of its efforts to locate Vasquez–Uribe, however, DEA New Jersey learned that DEA Colombia and Colombian authorities were jointly investigating Vasquez–Uribe and his associates. Due to the ongoing nature of the investigation, DEA Colombia—which does not conduct operations in Colombia without the assistance of the Colombian government—specifically requested that DEA New Jersey resist pursuing extradition at that time. DEA New Jersey honored the request, and American law enforcement took alternative measures to attempt to locate Vasquez–Uribe internationally and to ensure he

would be detained if he were to travel within the United States. The United States Marshals Service entered Vasquez–Uribe's name into the National Crime Information Center database to ensure it would be notified if he was arrested by an agency with access to that system, and DEA New Jersey continued to cooperate with the National Central Bureaus of Interpol member countries in an active effort to locate and apprehend Vasquez–Uribe.

In August 2006, DEA New Jersey learned Vasquez–Uribe had reentered Colombia, and it received word that Colombian authorities would arrest him upon receipt of a provisional arrest warrant. Shortly thereafter, the United States sent a request for a provisional arrest warrant to the embassy in Colombia, and Vasquez–Uribe was arrested there on or about October 6, 2006. Within 60 days of his arrest, the United States submitted a formal extradition application, and the Colombian government approved the extradition on or about June 18, 2007. Vasquez–Uribe was surrendered to the United States in August 2007, and he made his initial appearance before the United States District Court for the District of New Jersey on August 8, 2007. Over the course of the next year, Vasquez–Uribe assented to multiple continuances as he made bona fide efforts to cooperate with the government and underwent a change in counsel.

Vasquez–Uribe waived his right to a jury trial. On December 23, 2008, the District Court, serving as trier of fact, found Vasquez–Uribe guilty on the two conspiracy counts and not guilty on the corresponding substantive counts. On July 22, 2009, the court sentenced Vasquez–Uribe to two concurrent 30–year terms of imprisonment. Vasquez–Uribe timely appealed.[1]

## II.

On appeal, Vasquez–Uribe raises three issues: (1) whether the government produced sufficient evidence to sustain a conviction under the conspiracy statutes; (2) whether the District Court misapplied the four-factor test articulated in *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), in determining Vasquez–Uribe had not been deprived of his Sixth Amendment right to a speedy trial; and (3) whether trial counsel's failure to call witnesses who theoretically might have offered favorable testimony transgressed Vasquez–Uribe's constitutional right to effective assistance of counsel.

## A.

First, Vasquez–Uribe argues the guilty verdicts rendered by the District Court were not supported by sufficient evidence.[2] Vasquez–Uribe contends any purported conspiracy to import or distribute cocaine terminated with the February 8, 2001 seizure of the drugs, which occurred before he became involved in the charged criminal activity. He claims he posed as an "independent agent in debt collection" af-

---

1. The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction to review the District Court's final decision under 28 U.S.C. § 1291.

2. Upon a challenge to the sufficiency of the evidence, "we review the evidence in the light most favorable to the government as verdict winner," *United States v. Applewhaite*, 195 F.3d 679, 684 (3d Cir.1999), and we must affirm "if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *United States v. Dent*, 149 F.3d 180, 187 (3d Cir.1998) (internal quotation omitted). "In making our review we examine the totality of the evidence, both direct and circumstantial. We must credit all available inferences in favor of the government." *United States v. Gambone*, 314 F.3d 163, 170 (3d Cir.2003).

ter the cocaine had been seized in an effort to exploit the vulnerability of Gil and Taylor and "to con his way into stealing funds from the real owners of the drugs." Because the government did not prove he was involved in the actual importation or distribution of the interdicted drugs, he maintains, his opportunistic post-seizure playacting cannot underpin conspiracy convictions since he did not agree with his alleged co-conspirators to pursue any unlawful purpose. We disagree.

The essential elements of a drug conspiracy under 21 U.S.C. § 846 are "(1) a shared unity of purpose, (2) an intent to achieve a common goal, and (3) an agreement to work together toward the goal." *United States v. Bobb,* 471 F.3d 491, 494 (3d Cir.2006) (internal quotation omitted).[3] A conspiracy may have multiple objectives, and the conspiracy endures beyond the attainment of its principal goal if "other subsidiary objectives" have yet to be achieved. *United States v. Walker,* 653 F.2d 1343, 1349–50 (9th Cir.1981) (citing *United States v. Hickey,* 360 F.2d 127, 141 (7th Cir.1966)). Hence, "where enrichment is an object of a conspiracy, the conspiracy continues until the conspirators receive the full economic benefits anticipated by their scheme." *United States v. McNair,* 605 F.3d 1152, 1214 (11th Cir. 2010), cert. denied, —— U.S. ——, 131 S.Ct. 1600, 179 L.Ed.2d 499 (2011); *see also United States v. Zolicoffer,* 869 F.2d 771, 773 (3d Cir.1989) ("Telephone conversations relating to a drug debt can be viewed as facilitating the conspiracy to distribute."); *United States v. James,* 494 F.2d 1007, 1026 (D.C.Cir.1974) ("A criminal conspiracy continues until the objects for which it was formed have been accomplished. Since one object of this conspira-

cy was illicit gain—the collection of money in exchange for drugs—it embraced the means ordinarily employed to accomplish that intended result.").

Additionally, an individual who did not participate "in the conception of the conspiracy" may nevertheless join belatedly and become responsible for the actions that antedated his arrival should he knowingly "co-operate in the common effort to obtain the unlawful results." *United States v. Lester,* 282 F.2d 750, 753 (3d Cir.1960). "At a minimum, . . . it must be shown that . . . a person has knowledge of the conspiracy's illicit purpose when he performs acts which further that illicit purpose." *United States v. McKee,* 506 F.3d 225, 241 (3d Cir.2007) (internal quotation omitted) (alteration in original). The elements of a conspiracy charge, including intent and agreement, "can be proven entirely by circumstantial evidence." *United States v. Brodie,* 403 F.3d 123, 134 (3d Cir.2005).

In the context of drug importation conspiracies, these principles have led to the conviction of defendants situated similarly to Vasquez–Uribe. For example, in *United States v. Knowles,* 66 F.3d 1146 (11th Cir.1995), the Eleventh Circuit upheld conspiracy convictions under 21 U.S.C. §§ 846 and 963 in analogous factual circumstances. There, the defendant, an attorney retained to represent an individual who had been arrested for captaining vessels used in drug smuggling ventures, first arranged to collect monies owed to his client for the client's role in the marijuana importation enterprise and subsequently funneled him the cash in stages. *Id.* at 1152–53. The court noted that although it

---

**3.** Because Congress enacted 21 U.S.C. §§ 846 and 963 within the same public law and utilized identical language when crafting these parallel conspiracy provisions, the govern-

ment must prove the same essential elements to sustain a conviction under either statute. *See United States v. Montgomery,* 150 F.3d 983, 998 and n. 4 (9th Cir.1998).

was "undisputed that Knowles played no overt role whatsoever in the actual importation or distribution of controlled substances," it was nevertheless reasonable for the trier of fact to convict on the conspiracy counts based on its conclusion that he "was aware of the scope and general plan of the conspiracy, participated in it, and profited from it." *Id.* at 1155–56. And in *United States v. Varella*, 692 F.2d 1352, 1362 (11th Cir.1982), the same court of appeals affirmed a district court's finding that a drug conspiracy had persisted beyond the seizure of marijuana by DEA officials while the participants "discuss[ed] how to minimize their losses" and "debated the apportionment of the loss and possible recovery through another importation." Consequently, the court concluded the district court had properly admitted testimony recounting incriminating statements made after the seizure because those statements were "in furtherance" of an ongoing conspiracy. *Id.*

■ Here, when viewed in the light most favorable to the government, the evidence was sufficient for the trier of fact to have found Vasquez–Uribe guilty of conspiracy to import and distribute cocaine. The District Court defined the conspiracy to which Vasquez–Uribe was a party as one in which the participants sought "not only to bring drugs in the United States and to distribute those drugs, but . . . also to get paid for those drugs," and it found Vasquez–Uribe had joined the enterprise "during the lifetime of the conspiracy, sharing a unity of purpose and intent to achieve the objective of receiving payment for those drugs, once they had been imported." The recorded conversations revealed Gil arranging to fax copies of the pledged securities prior to the drugs being seized, evidence that demonstrates the parties considered payment to be a core facet of the conspiracy regardless of whether the delivery proved successful. Enlisted to collect on the drug debt, Vasquez–Uribe played an integral role in actualizing this aspect of the scheme.

Much as how the defendant's attempts to recoup a drug-related debt were found to be "in furtherance" of the charged conspiracy in *Knowles* despite having wholly occurred after the boat and drugs had been seized, Vasquez–Uribe's comparable efforts placed him squarely within the scope of the charged conspiracy. As did the Eleventh Circuit in *Varella*, we conclude the District Court here acted properly in finding the conspiracies continued beyond the date of the seizure as the conspirators attempted to decipher what had transpired and as Vasquez–Uribe sought to defray his losses by appropriating the collateral that had been pledged on the debt and by broaching the possibility of an additional importation.

Thus, by insinuating himself into an ongoing conspiracy through seeking to obtain payment for the seized cocaine, Vasquez–Uribe exposed himself to the charges on which he was convicted. The evidence was sufficient to demonstrate that Vasquez–Uribe was cognizant of the nature of the conspiratorial scheme and that the scheme entailed receiving payment for the seized drugs. Rather than simply commiserating about a foiled conspiracy that had already met its demise, Vasquez–Uribe helped pursue the conspiracy to its logical end by attempting to collect on the drug debt. *See Zolicoffer*, 869 F.2d at 773; *James*, 494 F.2d at 1026. That he may have joined the enterprise after its inception and without having participated in the actual importation or distribution is not determinative under the conspiracy statutes at issue. As evidenced by the wealth of intercepted conversations introduced as government exhibits, Vasquez–Uribe—aware of his confederates' illicit aims—became a wit-

ting participant in an active conspiracy. He did not disclose his purported ruse to fleece Gil and Taylor out of their money at any point during the course of his extended efforts to cooperate with government officials, and the District Court was entitled to discredit his testimony in the face of contrary evidence. *See United States v. Stuart*, 22 F.3d 76, 80 (3d Cir.1994) ("The question of intent was a simple credibility decision, and [the defendant] lost.").

Therefore, we conclude the conspiracy convictions were premised on sufficient evidence, and we will deny Vasquez–Uribe's request for relief on this ground.

### B.

■ Next, Vasquez–Uribe alleges he was deprived of his Sixth Amendment right to a speedy trial.[4] Vasquez–Uribe was indicted in November 2001 but was not extradited from Colombia until August 2007 and did not stand trial until December 2008. In a pretrial ruling on December 9, 2008, the District Court, employing the four-factor test governing constitutional speedy trial claims elucidated by the Supreme Court in *Barker*, denied Vasquez–Uribe's motion to dismiss the indictment on this ground. Although we conduct a plenary review of "a district court's legal conclusion regarding a defendant's claim that his constitutional right to a speedy trial was violated," *United States v. Battis*, 589 F.3d 673, 677 (3d Cir.2009), we must review its determination as to whether the government proceeded with reason-

able diligence "with considerable deference," *Doggett v. United States*, 505 U.S. 647, 652, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992). Here, the District Court's finding that the government acted with reasonable promptness in locating, extraditing, and ultimately trying Vasquez–Uribe was amply supported by the record.

The District Court correctly identified and employed the balancing test outlined in *Barker*, which instructs a trial court to consider four factors in determining whether a defendant's Sixth Amendment right to a speedy trial has been violated: (1) the length of the delay; (2) the reason for the delay; (3) whether and how the defendant asserted his constitutional rights; and (4) the resultant prejudice. *See* 407 U.S. at 530, 92 S.Ct. 2182. Although the first factor tilts in Vasquez–Uribe's favor, the District Court permissibly accorded it little weight.[5] As we have written, "the seriousness of a post-accusation delay varies depending on the circumstances, and a waiting period during which the defendant is not detained presents fewer concerns than a wait accompanied by pretrial incarceration." *United States v. Dent*, 149 F.3d 180, 184 (3d Cir.1998). As detailed above, Vasquez–Uribe remained at-large for the bulk of the pretrial delay. Moreover, a protracted delay does not, in and of itself, constitute a Sixth Amendment violation, and the government may neutralize its "negative implications" by making a strong showing on the second *Barker* factor. *See Garcia Montalvo v.*

---

**4.** "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial...." U.S. Const. amend. VI.

**5.** "[D]elay is measured from the date of formal accusation, i.e., from the earliest date of arrest or indictment[,] until the commencement of trial." *Hakeem v. Beyer*, 990 F.2d 750, 760 (3d Cir.1993). Here, the interval between indictment and trial was sufficiently lengthy to occasion examination of the other

*Barker* factors. *See Dent*, 149 F.3d at 184 (finding a five-year delay between arrest and trial "sufficiently lengthy to trigger full inquiry into the possibility that [the defendant] suffered prejudice as a result"); *Barker*, 407 U.S. at 530, 92 S.Ct. 2182 ("Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors....").

*United States,* 862 F.2d 425, 426 (2d Cir. 1988).

The District Court found the balance of the *Barker* factors supported the government's position. As to the second factor, the court carefully scrutinized the government's attempts to apprehend Vasquez–Uribe and concluded the delay was principally a function "of the different factions that were involved, specifically Interpol and other countries." Because the government assiduously collaborated with foreign and multinational law enforcement agencies in its efforts to locate Vasquez–Uribe, the court concluded the lapse in time between the indictment and the extradition was "not unreasonable in light of [the] circumstances." [6] Furthermore, with respect to the third factor, Vasquez–Uribe's first formal assertion of his right to a speedy trial did not come until November 24, 2008, more than one year after his initial appearance. Whereas Vasquez–Uribe began emphatically protesting his innocence and expressing his desire to accelerate the pace of the proceedings in correspondence to the District Court in the summer of 2008, he did not formally invoke his right to a speedy trial until two weeks before the trial commenced.

And as to the fourth *Barker* factor, the court found the delay would not prejudice Vasquez–Uribe at trial because the nature of the government's case, which was heavily reliant on intercepted conversations, vitiated any concern that Vasquez–Uribe's defense would be hamstrung by unavailable witnesses or poorly preserved physical evidence.[7] On account of the sheer length of the delay between the issuance of the indictment and his trial, Vasquez–Uribe argues he is entitled to a presumption of prejudice. *See Doggett,* 505 U.S. at 655, 112 S.Ct. 2686 ("[W]e generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify."). The government counters that it acted with reasonable diligence and that Vasquez–Uribe failed to demonstrate any specific prejudice. *See id.* at 656, 112 S.Ct. 2686 (explaining that the presumption of prejudice diminishes upon a showing of reasonable diligence from indictment to arrest and cannot be revived absent a showing of "specific prejudice"). Vasquez–Uribe contends for the first time on appeal that Taylor and Gil would have testified and corroborated his account had the trial been held more expeditiously.[8] However, Vas-

6. The court did not directly address the delay between Vasquez–Uribe's arrival in the United States and the start of his trial. However, its blanket assertion that the government acted with reasonable diligence indicates it accepted the government's attribution of the additional delay to Vasquez–Uribe's accession to multiple continuances as he sought to limit his criminal exposure by cooperating with law enforcement officials in other investigations.

7. The Supreme Court has recognized postindictment delay may engender three distinct forms of prejudice: (1) he may suffer from "oppressive pretrial incarceration"; (2) he may suffer from "anxiety and concern" on account of the unresolved charges; and (3) he may have his defense impaired by "dimming

memories and loss of exculpatory evidence." *Doggett,* 505 U.S. at 654, 112 S.Ct. 2686. Because Vasquez–Uribe remained at-large for the majority of this interval and was ostensibly unaware of the indictment prior to his apprehension, only the latter form of prejudice is potentially applicable in this instance.

8. Vasquez–Uribe persistently prevailed upon his trial counsel to subpoena Taylor and Gil as witnesses. Gil was deported from the United States in 2004 and was therefore beyond the subpoena power of the District Court. Vasquez–Uribe's counsel had an investigator twice interview Taylor, who was incarcerated in Texas. After receiving word Taylor had invoked his right to counsel and had indicated a staunch unwillingness to tes-

quez–Uribe did not raise this argument before the District Court, and the record contains scant evidence to support his theory that the delay was the proximate cause of the witnesses' unavailability or reticence.[9] Hence, the fourth *Barker* factor does not weigh in Vasquez–Uribe's favor.

Therefore, we will defer to the District Court's finding as to reasonable diligence, and we conclude Vasquez–Uribe was not deprived of his right to a speedy trial.

### C.

Lastly, Vasquez–Uribe contends he suffered from constitutionally defective assistance of counsel. Vasquez–Uribe alleges that, in failing to call Gil or Taylor, witnesses purportedly poised to offer exculpatory testimony, trial counsel performed in a manner that was both objectively unreasonable and prejudicial to his defense. *See Strickland v. Washington,* 466 U.S. 668, 687–92, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

In general, we do not entertain claims of ineffective assistance of counsel on direct appeal. *United States v. Haywood,* 155 F.3d 674, 678 (3d Cir.1998). "We have repeatedly held that the proper avenue for pursuing such claims is through a collateral proceeding in which the factual basis for the claim may be developed." *Id.* (internal quotation omitted). This rule does permit a narrow exception for cases in which the record is sufficiently robust as to render plausible a determination on the merits without the benefit of an evidentiary hearing, *see id.,* but we do not believe this to be such a case. Although both parties argue the record contains abundant information upon which to base a conclusive assessment of trial counsel's performance, we decline to deviate from our reluctance to adjudicate such claims in the absence of further factual development. We note that this disposition leaves Vasquez–Uribe free to pursue his ineffective assistance claim in a habeas corpus proceeding under 28 U.S.C. § 2255.

### III.

For the foregoing reasons, we will affirm the judgment of conviction and sentence. If Vasquez–Uribe elects to pursue his ineffective assistance of counsel claim further, he may do so within the framework of a collateral review proceeding.

---

tify on Vasquez–Uribe's behalf, trial counsel made a strategic determination—over the protests of his client—to decline to subpoena Taylor. This decision forms the basis of Vasquez–Uribe's ineffective assistance claim, which is discussed *infra* at Section II.C.

9. Indeed, had Vasquez–Uribe been arrested earlier, Gil and Taylor may have had an opportunity to obtain a reduced sentence by confirming the contents of the recorded conversations and testifying against Vasquez–Uribe.