**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0366n.06

No. 10-1049, 10-1223

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

*Apr 12, 2013*

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| Plaintiff-Appellee, | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF MICHIGAN |
| v. | ) | |
| | ) | |
| MICHAEL WAYNE HESHELMAN, | ) | |
| BRYCE HENRY SHERWOOD, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

Before:  CLAY, GIBBONS and WHITE, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.**   Defendants-Appellants Michael Heshelman ("Heshelman") and Bryce Sherwood ("Sherwood") appeal the district court's determination that the approximately three-year delay between indictment and trial did not violate their Sixth Amendment speedy trial rights, and also allege error in the court's calculation of their respective sentences.  In addition, Heshelman challenges the restriction on cross-examination of his co-conspirators.  Because we conclude that the appellants' speedy trial rights were violated, we REVERSE.

**I.**

On February 23, 2006, twenty days before the statute of limitations would have expired, the government filed a fifty-three count indictment against Heshelman, Sherwood and Dennis Mickelson ("Mickelson"), alleging conspiracy, wire fraud, money laundering, international money laundering,

and forfeiture. All counts in the indictment stem from a Ponzi scheme run by Heshelman, Sherwood and Mickelson between 1999 and 2006. The last overt act alleged in the indictment occurred in 2001. The government moved to seal the indictment the day it was filed "in order that the execution of the arrest warrant be unimpeded and the investigation continue." Although the court granted the motion, the government conducted no further investigation of the indicted charges except to keep a journal of Heshelman's contacts with one of the victims.

## HESHELMAN

At the time of the indictment, the government knew Sherwood's and Mickelson's addresses and that Heshelman probably lived in Zurich, Switzerland. The government did not have Heshelman's address at that time but subsequently discovered that Heshelman listed a Swiss address on his passport application. Although the United States has an extradition treaty with Switzerland that covers all of the charges in the indictment, the government decided not to immediately pursue Heshelman's extradition due to concerns that the Swiss government would refuse to extradite him on the money laundering counts. In July 2006, the United States submitted a request for a legal opinion from the Swiss government on whether it would extradite Heshelman on the money laundering counts but did not receive a response at that time.

Due to Swiss regulations, the government was not allowed to either independently pursue Heshelman in Switzerland or initiate any contact with Heshelman, but had to pursue all contact through the FBI's legal attaché office in Switzerland. However, in 2006, Heshelman attempted to contact FBI Agent Timothy Wetherbee ("Agent Wetherbee"), the primary agent assigned to Heshelman's case, and left multiple voicemails. Heshelman finally reached Agent Wetherbee on

November 16, 2006. During this telephonic conversation, Heshelman informed Agent Wetherbee that he knew he was under investigation in the United States and complained that no one had contacted him about the investigation's status and that the investigation was hampering his business. When Agent Wetherbee requested Heshelman's address, Heshelman responded that he lived in Zurich, Switzerland, but declined to give his exact address, stating "If I tell you where I am living, you will come and arrest me." During this phone conversation Agent Wetherbee neither asked Heshelman to return to the United States nor informed Heshelman about the indictment.[1]

Although the government delayed seeking Heshelman's extradition, it sought the Swiss government's assistance in locating Heshelman. In September and November 2006, and February 2007, Agent Wetherbee asked the Swiss government if it could locate a physical address for Heshelman based on his telephone number and Internet protocol address.[2] The Swiss government responded in January 2007 that it was unable to locate Heshelman and in June 2007 that it had traced the Internet protocol address to an Internet cafe. Agent Wetherbee's February 2007 request to the Swiss government was the last attempt by the government to locate Heshelman or actively secure his return to the United States for almost two years.

In December 2007, the Swiss government informed Agent Wetherbee that it had a possible address for Heshelman but would not proceed further without a provisional arrest warrant. The

---

[1]Although Agent Wetherbee testified that some investors had notified Heshelman and Sherwood about the grand jury proceedings, there is no evidence that Heshelman knew that the sealed indictment had been obtained.

[2]Agent Wetherbee did not provide the Swiss government with the Swiss address Heshelman listed on his passport application.

government decided to take no action out of concern that it would be obligated to extradite Heshelman within a specified period of time without knowing for certain whether the Swiss government would extradite him on the money laundering charges.

In addition to extradition, the government had another available option for locating and arresting Heshelman—obtaining a notice of outstanding arrest warrant (red notice) through Interpol. When a person who is the subject of a red notice tries to enter a country, a red notice is triggered notifying the authorities that the person is wanted by another country. The country is then notified of the person's location. Although some countries will arrest a person who is subject to a red notice, others, including Switzerland, will not. While living in Switzerland, Heshelman traveled throughout Europe and the Dominican Republic using his own passport; thus, presumably, a red notice would have triggered a notice to the government of his whereabouts, and possibly his arrest. The government decided not to seek a red notice due to the lack of control over which country would locate Heshelman and the possibility of that country not having an extradition treaty with the United States.

Around March 2008, the United States Attorney's Office in the Western District of Michigan decided to start gathering the requisite information in the event the government decided to pursue extradition. In May 2008, those documents were submitted to the Department of Justice. However, the government did not actively pursue Heshelman's extradition until around November or December 2008, when the Swiss government notified the United States that Heshelman had been arrested by Swiss authorities for a fraud perpetrated in Switzerland. The Swiss government informed the United States that it knew Heshelman's location and would cooperate with the United States if

it had a provisional arrest warrant, but absent a provisional arrest warrant, Heshelman might be deported to a country of his choice. At that point, the United States concluded that the only option was to obtain a provisional arrest warrant and seek Heshelman's extradition.

The court unsealed the indictment on December 12, 2008, so that it could be attached to the extradition packet. The United States requested Heshelman's extradition on February 2, 2009. Although Heshelman contested the extradition, the Swiss government granted the United States' request on February 27, 2009.

The U.S. Marshals returned Heshelman to the United States between March 17 and March 27, 2009. Heshelman's seven-day jury trial commenced on June 2, 2009, and the jury convicted him on all counts.

## SHERWOOD

On December 18, 2008, FBI agents informed Sherwood that there was a warrant for his arrest. Soon thereafter, Sherwood contacted Agent Wetherbee and indicated he wanted to cooperate and voluntarily surrender. Mickelson also voluntarily surrendered himself in December 2008, after being informed of the arrest warrant and asked if he could cooperate. Mickeslon and Sherwood pleaded guilty to count one of the indictment (conspiracy to commit wire fraud) on May 19, 2009 and May 26, 2009, respectively.

## II.

Heshelman claims his Sixth Amendment right to a speedy trial was violated because the government intentionally delayed arresting him and bringing him to trial for over three years.

Sherwood claims the government violated his Sixth Amendment speedy trial right because it knew his whereabouts but intentionally decided not to proceed with his trial until Heshelman was arrested.

We review questions of law related to speedy trial violations de novo and questions of fact under the clearly erroneous standard. *United States v. Robinson*, 455 F.3d 602, 607 (6th Cir. 2006). The Sixth Amendment to the United States Constitution guarantees all criminal defendants the right to a speedy trial. U.S. Const. amend. VI. "When a defendant's constitutional right to a speedy trial has been violated, dismissal of the indictment is the only available option even when it allows a defendant who may be guilty of a serious crime to go free." *United States v. Brown*, 169 F.3d 344, 348 (6th Cir. 1999). To determine whether a speedy trial violation has occurred, we must balance four factors: length of trial delay, reason for delay, defendant's assertion of his right to a speedy trial, and prejudice to the defendant. *Barker v. Wingo*, 407 U.S. 514, 530 (1972). The Supreme Court has clarified that

> none of the four factors identified above [is] either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process. But, because we are dealing with a fundamental right of the accused, this process must be carried out with full recognition that the accused's interest in a speedy trial is specifically affirmed in the Constitution.

*Id.* at 533.

### A.

With respect to the first factor, length of delay, a trial delay of one year or more is generally deemed "presumptively prejudicial" and triggers inquiry into the remaining factors. *Doggett v.*

*United States*, 505 U.S. 647, 652, n.1 (1992). The government concedes that the thirty-nine month delay at issue in Heshelman's case is presumptively prejudicial.[3] The government also concedes that the appellants timely asserted their speedy trial rights. Thus those factors weigh in Heshelman's favor, and we will limit our discussion to the second and fourth factors, reason for delay and prejudice.

**B.**

When analyzing the reason why the defendant's trial was delayed, we must determine "whether the government or the criminal defendant is more to blame for that delay." *Doggett*, 505 U.S. at 651. Although no single factor is dispositive in the speedy trial analysis, this factor is "[t]he flag all litigants seek to capture." *United States v. Loud Hawk*, 474 U.S. 302, 315 (1986). Where the government acts with reasonable diligence in bringing a defendant to trial, "a defendant who cannot demonstrate how his defense was prejudiced *with specificity* will not make out a speedy trial claim no matter how great the ensuing delay." *United States v. Young*, 657 F.3d 408, 418 (6th Cir. 2011) (internal citations omitted). However, if the government intentionally delays the trial to gain some tactical advantage over the defendant, that is "weighted heavily against the government." *Barker*, 407 U.S. at 531; *see Robinson*, 455 F.3d at 607. Neutral reasons for delay such as governmental negligence or overcrowded courts are still weighted against the government, but not as heavily. *Barker*, 407 U.S. at 531. Conversely, if the delay is for a valid reason, such as a missing

---

[3]Although the government contends the delay is only 34 months, the trial delay is calculated from the date of indictment to trial—in Heshelman's case, 39 months. *Brown*, 169 F.3d at 349 n.3. However, the two-week period during which Heshelman contested his extradition is excluded from this calculation.

witness, that will not be weighted against the government. *Id.* Nonetheless, "[a] defendant has no duty to bring himself to trial; the [government] has that duty . . . ." *United States v. Ingram*, 446 F.3d 1332, 1337 (6th Cir. 2006) (quoting *Barker*, 407 U.S. at 527). Due to the government's "affirmative constitutional obligation to try the defendant in a timely manner . . . the burden is on the prosecution to explain the cause of the pretrial delay." *Brown,* 169 F.3d at 349 (quoting *United States v. Graham*, 128 F.3d 372, 374 (6th Cir. 1997)).

Heshelman argues that despite the government's knowledge that he resided in Switzerland at the time of the indictment and the existence of a treaty between the United States and Switzerland that allows for extradition on all the charges against him, the government intentionally decided not to pursue extradition based on an unfounded fear that the Swiss government would not extradite him on the money laundering charges. The government also failed to place a red notice in Interpol, which could have led to Heshelman's arrest during his travels to other foreign countries. Instead, the government chose to refrain from pursuing the available options to retrieve him from Switzerland and wait for him to voluntarily return to the United States because it wanted to have complete control over the charges that could be tried.

The government admits that it used a "wait-and-see" strategy with Heshelman and hoped to arrest him whenever he returned to the United States to visit his family. The government argues this strategy was reasonable due to the difficulties in pursuing extradition and the lack of control over the offenses on which Heshelman would be extradited.

Once an indictment is filed, the government must be reasonably diligent in its efforts to locate the defendant(s) charged. *See United States v. Hayes,* 40 F.3d 362, 365 (11th Cir. 1994) (citing

*Smith v. Hooey*, 393 U.S. 374, 383 (1969)). When the defendant knows about the charges and actively seeks to evade detection, the government is permitted to expend less effort to locate the defendant. *See, e.g., United States v. Arceo*, 535 F.3d 679, 685–86 (7th Cir. 2008) (despite government's negligence in waiting over four years after the indictment to obtain an arrest warrant, blame for delay lied with defendant who was informed by the government of its intent to bring charges against him, fled jurisdiction and used alias to avoid detection).

However, if a defendant is unaware of the indictment, the government's burden is higher. *See Brown*, 169 F.3d at 349–50 (government did not act with reasonable diligence where defendant was unaware of the indictment and government attempted to locate him through surveillance of his home but did not inform defendant's lawyer about the indictment although the lawyer specifically requested to be informed); *Ingram*, 446 F.3d at 1337–38 (no reasonable diligence where government methods to locate defendant included driving by his house and leaving telephone messages but government failed to inform defendant about indictment when he returned the government's phone call).

The government is obligated to act diligently even when the defendant is located in a foreign country. In *United States v. Mendoza*, the Ninth Circuit found that the government did not make a "serious effort" to locate a defendant who went to the Phillipines before the indictment was filed. 530 F.3d 758, 763 (9th Cir. 2008). Although the defendant refused to give the government his exact location, the government was able to speak with the defendant twice after leaving messages with defendant's relatives. Because the government never informed the defendant about the indictment

9

and waited four months after his return to the United States to arrest him, the court found the government did not act diligently. That court explained:

> Even though Mendoza left the country prior to his indictment, the government still had an obligation to attempt to find him and bring him to trial . . . [T]he government was required to make some effort to notify Mendoza of the indictment, or otherwise continue to actively attempt to bring him to trial, or else risk that Mendoza would remain abroad while the constitutional speedy-trial clock ticked. However, the government made no serious effort to do so.

*Id.*; *see also Doggett*, 505 U.S. at 652–53 (no reasonable diligence where defendant went to Columbia before the indictment and law enforcement entered defendant's name in database but entry expired, which allowed defendant to return to United States and live openly for six years before arrest). In contrast, reasonable diligence has been found where the government seeks the assistance of foreign governments and uses the tools available to find and extradite the defendant. *See United States v. Vasquez-Uribe*, 426 F. App'x 131, 138 (3d Cir. 2011) (affirming district court's finding that "[b]ecause the government assiduously collaborated with foreign and multinational law enforcement agencies in its efforts to locate [the defendant] . . . the lapse in time between the indictment and the extradition was not 'unreasonable in light of the circumstances.'"); *Hayes*, 40 F.3d at 365–66 (finding that the government acted with reasonable diligence where over a fifty-two month period it asked the United Kingdom for assistance in obtaining the defendant from Zimbabwe, filed notices with Interpol, made inquiries to the Zimbabwean embassy about the defendant's whereabouts, filed a provisional arrest warrant in the United Kingdom in case the defendant was deported to that country, and attempted to locate the defendant in other countries).

On the other hand, diligent pursuit does not require that extradition be pursued when it would be futile. *See, e.g.*, *United States v. Corona-Verbera*, 509 F.3d 1105, 1114–15 (9th Cir. 2007) (government's failure to pursue extradition from Mexico when Mexican government had policy of not extraditing its citizens on narcotics charges was not negligent); *United States v. Blanco*, 861 F.2d 773, 778 (2d Cir. 1988) (no government negligence where Colombia had policy of not extraditing its citizens during the relevant period); *see also United States v. Bagga*, 782 F.2d 1541, 1543–44 (11th Cir. 1986) (no negligence where extradition treaty with India did not "expressly cover" the offense for which defendant was charged).

In this case, actively seeking Heshelman's extradition would not have been futile because the United States has an extradition treaty with Switzerland that covers all the charges at issue. The government did not pursue extradition for almost three years because of the possibility that Switzerland would place conditions on Heshelman's extradition. However, the government made only one attempt to find out what those conditions would be, if any. On the occasions where the government actively sought the Swiss government's assistance in finding Heshelman, the Swiss government responded with the requested assistance. Subsequently, when the Swiss government informed the United States that it had a possible address for Heshelman, which it would disclose if the United States obtained a provisional arrest warrant, the government declined to do so. Instead, the government decided to enter Heshelman's name in a law enforcement database and simply wait for notification of Heshelman's voluntary return to the United States.

The government contends that the failure to pursue Heshelman's extradition earlier was justified by the obstacles typically involved in obtaining extradition and the difficulties in obtaining

assistance from the Swiss government on this matter. In *United States v. Pomeroy*, 822 F.2d 718 (8th Cir. 1987), the government advanced a similar argument and claimed that despite Canada's extradition treaty with the United States, the Canadian Extradition Act, which gave Canadian officials the discretion to deny extradition, justified the government's failure to seek extradition of a defendant located in that country. The Eighth Circuit disagreed, finding "nothing in the record" to indicate that Canadian officials would have denied extradition upon proper request by the United States. *Id.* at 721–22.

Likewise, the government in this case provides no evidence to support its claim that extraditing Heshelman from Switzerland would have been difficult. On the contrary, the record demonstrates that the Swiss government willingly provided assistance when able and that once the United States finally decided to request extradition the Swiss government acted promptly and granted the government's request in two weeks.

Certain intentional delays by the government are justifiable. We stated in *United States v. Schreane*, 331 F.3d 548, 555 (6th Cir. 2003), that a decision by the federal government to delay a defendant's trial until the state government completed its prosecution of the defendant "is without question a valid reason for delay." *But see United States v. Battis*, 589 F.3d 673, 680 (3d Cir. 2009) ("The Government cannot indict a defendant and then delay a case indefinitely, without any notice to a federal judge, merely because it is aware of a state proceeding involving the same defendant.") Postponing a trial in order to find a missing witness is another example of intentional delay that is valid. *See United States v. Anderson*, 471 F.2d 201, 203 (5th Cir. 1973). Nor can the government intentionally prevent a defendant from pleading guilty and obtaining the benefits of a negotiated plea

bargain to ensure the defendant testifies against other defendants in a related case. *United States v. Roberts*, 515 F.2d 642, 646–47 (2d Cir. 1975).

Here, the government deliberately chose not to extradite Heshelman sooner because it wanted to ensure that Heshelman could be tried on the money laundering charges. Although the government cannot be faulted for its desire to try Heshelman on all charges in the indictment, its willingness to wait for an indefinite period of time to fulfill that desire is inconsistent with the dictates of the Sixth Amendment. The government's strategy of waiting for Heshelman to return to the United States is even more troubling given Agent Wetherbee's testimony that the last record of Heshelman's presence in the United States was in January of 2004, two years before the indictment. The government continued to wait until Swiss officials informed the United States that Heshelman might be deported to a country of his choice, which could conceivably have denied the government the opportunity to try Heshelman on the charges.

Drawing a line between intentional delays that are permissible and those that are impermissible, with deferring prosecution because of an ongoing trial by another sovereign (*see Schreane*, 331 F.3d at 555) or a missing witness (*see Anderson*, 471 F.2d at 203) on one side of the line, and deferring prosecution as a means to exert pressure on a potential cooperating witness (*see Roberts*, 515 F.2d at 646–47) on the impermissible side, the government's conduct in this case falls on the side of the impermissible. Despite the complete absence of any indication that Switzerland would not extradite Heshelman on the money laundering charges, the government still chose to intentionally delay pursuing Heshelman's extradition for nearly three years simply because it wanted to choose the location of Heshelman's arrest and ensure absolute control over the charges brought

against him. The ability to try Heshelman on money laundering, the indicted charge with the longest maximum sentence, undoubtedly worked to the advantage of the government, insofar as it provided the government with greater plea bargaining power and allowed the government to obtain a more severe penalty upon conviction. Although the government could have reasonably waited for a short period of time for Heshelman to voluntarily return to the United States, once the wait became presumptively prejudicial, the intentional delay by the government was no longer justifiable. As a result, this factor weighs heavily against the government.

The government argues that Heshelman is nonetheless responsible for the delay because he was a fugitive evading prosecution. However, a person under investigation for a crime in the United States is not transformed into a fugitive solely on the basis of his or her residence in a foreign jurisdiction or country. *See Mendoza*, 530 F.3d at 763. The record demonstrates that Heshelman periodically resided in Switzerland prior to any investigation into his Ponzi scheme and was living in Switzerland at the time of the indictment. Although Heshelman did decline to give Agent Wetherbee his address for fear of arrest, he also made multiple calls to Agent Wetherbee to find out the status of the government's investigation. There is no evidence that Heshelman knew either that charges had been filed against him or that the government had concluded its investigation of the Ponzi scheme and found him criminally culpable.[4]

---

[4]Thus, this case is distinguishable from cases in which a defendant flees the jurisdiction because he knows that criminal charges have been filed or are imminent. We further note the inconsistencies in the government's argument, as it first attempts to justify not informing Heshelman about the indictment because it wanted Heshelman to voluntarily return to the United States and then takes the opposite position that Heshelman already knew about the charges against him and was a fugitive evading prosecution.

Although the district court's conclusion that the government acted with reasonable diligence is entitled to "considerable deference," *Doggett*, 505 U.S. at 652, that conclusion was based on the clearly erroneous determinations that Heshelman was responsible for the delay as a fugitive evading prosecution and that the government acted reasonably considering the difficulties in obtaining extradition.[5] But, as discussed above, Heshelman was not a fugitive evading prosecution and the government failed to discharge its "constitutional duty to make a diligent, good-faith effort to bring [Heshelman] before the [district] court for trial." *Pomeroy*, 822 F.2d at 722 (quoting *United States v. McConahy*, 505 F.2d 770, 773 (7th Cir. 1974)).

## C.

The final factor in the speedy trial analysis is prejudice.

In *United States v. Mundt*, we explained:

> When a defendant is unable to articulate the harm caused by delay, the reason for the delay . . . will be used to determine whether the defendant was presumptively prejudiced. If the government has been diligent in its pursuit of a defendant and delay was "inevitable and wholly justifiable," a speedy trial claim will generally fail . . . If, on the other hand, the government has been intentionally dilatory for the purpose of impairing the defendant's defense, violation will almost surely be found . . . Between these two extremes lies negligence. "While not compelling relief in every case where bad-faith delay would make relief virtually automatic, neither is negligence automatically tolerable simply because the accused cannot demonstrate exactly how it has prejudiced him."

29 F.3d 233, 236–37 (6th Cir. 1994) (internal citations omitted).

We held in *United States v. Ferreira*, 665 F.3d at 701, 708 (6th Cir. 2011), that a thirty-five-month delay caused by the government's gross negligence was sufficient to presume prejudice.

---

[5]We note that the district court deemed this case a "close call."

Although we explained in *Ferreira* that not every three-year delay will result in a presumption of prejudice, we found it was warranted in that case because "we give greater weight to those delays for which the government is at fault." *Id.* at 709. Similarly, the instant delay attributable to the government's intentional delay in seeking extradition warrants a presumption of prejudice. The government has not rebutted this presumption.

Each factor in the speedy trial analysis—the three-year delay (over three times the amount considered to be presumptively prejudicial), the reason for delay (the government's purposeful refusal to employ the extradition process), Heshelman's timely assertion of his speedy trial right, and the presumptive prejudice—all weigh in Heshelman's favor. On balance, the factors mandate a finding that Heshelman's speedy trial rights were violated.

## III.

Our analysis differs slightly for Sherwood as the government could have arrested him at any time. The government concedes that the thirty-nine month delay in Sherwood's case is presumptively prejudicial. The government also concedes that Sherwood timely asserted his speedy trial rights. These factors weigh in Sherwood's favor, and we discuss only the government's reason for delay and prejudice. As soon as the indictment was unsealed and a warrant issued for Sherwood's arrest, Sherwood voluntarily turned himself in. Further, the government admits that it delayed trying Sherwood because it thought that Sherwood might be able to prevail at trial if he could blame an absent Heshelman for all wrongdoing.

Although the government generally has a legitimate interest in trying co-conspirators together, such interest does not automatically constitute a justifiable reason for delay. We explained

16

in *United States v. Jackson*, 473 F.3d 660, 666 (6th Cir. 2007), that the government's decision to delay a defendant's trial to pursue higher-priority co-defendants was not a valid reason for delay. Additionally, in *United States v. Holyfield*, we found the delay caused by a co-defendant's pre-trial appeal weighed in the defendant's favor because the government could have chosen to proceed with the defendant's trial while his co-defendant's appeal was pending. 802 F.2d 846, 848 (6th Cir. 1986).

Although delays due to the government's diligent efforts to locate and try co-defendants may normally constitute "neutral" reasons for delay that are not weighted heavily against the government, that is not the situation here. As discussed above, the government did not delay Sherwood's trial while it diligently sought to locate Heshelman. Rather, the three-year intentional delay of Sherwood's trial was a result of the government's intentional delay in extraditing Heshelman. As a result, the government's unjustifiable reason for delay weighs heavily in Sherwood's favor.

Because the government is at fault for the thirty-nine month delay between Sherwood's indictment and guilty plea, he also warrants a presumption of prejudice. *Ferreira*, 665 F.3d at 709. The government has failed to rebut this presumption. As with Heshelman, all four speedy trial factors weigh in Sherwood's favor, with three factors having strong weight. Accordingly, we conclude that Sherwood's Sixth Amendment speedy trial rights have been violated.

**IV.**

For the foregoing reasons, we REVERSE the district court's denial of the motion to dismiss and remand with instructions to dismiss the indictment against Heshelman and Sherwood with prejudice.[6]

**CLAY, Circuit Judge, concurring.** I agree with the majority that Defendants' speedy trial rights were violated, but write separately to provide additional explanation concerning the standard of review with respect to the second *Barker* factor: reason for delay. *Barker v. Wingo*, 407 U.S. 514, 530–31 (1972).

To determine whether a speedy trial violation has occurred, courts look to the four *Barker* factors: length of trial delay, reason for delay, defendant's assertion of his right to a speedy trial, and prejudice to the defendant. *Id.* at 530. The majority correctly lays out the primary standard of review for speedy trial cases: questions of law are reviewed *de novo* and questions of fact are reviewed for clear error. Maj. Op. at 6 (citing *United States v. Robinson*, 455 F.3d 602, 607 (6th Cir. 2006)). But when the controlling issue of whether Defendants' speedy trial rights were violated requires us to balance factors, we must also ask how we are to review the district court's findings on each of those factors. *See, e.g.*, *United States v. Grigsby*, ___ F.3d ___, No. 11-3736, slip op. at 8 (6th Cir. Apr. 11, 2013) (noting the use of differing standards of review for each factor in a four-factor balancing test).

That question is easily answered with respect to first and third *Barker* factors, length of delay and defendant's assertion of his right to a speedy trial, respectively. Both are clearly questions of

---

[6]Given this ruling we need not discuss the additional challenges raised by Heshelman and Sherwood on appeal.

18

fact that we review for clear error. The other two factors do not admit to quite so easy answers. The fourth factor, prejudice, likely presents a mixed question of law and fact which we would review *de novo*, *cf. Wilson v. Parker* 515 F.3d 682, 707 (6th Cir. 2008) (noting that the prejudice prong of an ineffective assistance of counsel analysis is a mixed question that is reviewed *de novo*), but the proper scope of our review of that factor need not be settled today. That leaves the second factor—reason for delay.

With respect to the reason for delay, the Supreme Court has told us that we must accord "considerable deference" to the district court. *United States v. Doggett* , 505 U.S. 647, 652 (1992). Considerable deference is not, however, a standard we frequently apply in connection with appellate review, but it would appear that in this context, considerable deference equates to clear error review, which is familiar. For the proposition that considerable deference applies in reviewing the second *Barker* factor, *Doggett* cited *McAllister v. United States*, 348 U.S. 19 (1954), an admiralty case that involved reviewing a "finding" of negligence, and a section of Wright & Miller's *Federal Practice and Procedure* that discusses *McAllister*. *Doggett*, 505 U.S. at 652. That section described *McAllister* as holding "that a determination of negligence is reviewed under the clearly erroneous rule." 9 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2590 (1st ed. 1971) (internal quotation marks omitted). Like negligence in admiralty cases, *Doggett* suggests that review of a district court's determination about whether the asserted reason for delay is justified is to be reviewed for clear error.[1]

---

[1] The other case cited by *Doggett* on this point is *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384 (1990), a case dealing with the imposition of sanctions under Federal Rule of Civil Procedure

Applying that familiar standard, a finding is clearly erroneous when, "although there may be evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Master*, 614 F.3d 236, 238 (6th Cir. 2010) (internal quotation marks omitted). In this case, the district court determined that "[t]his case lies somewhere in the middle ground in assessing responsibility for the delay," finding that the government's conduct was not "attributable to bad faith" but was also not "absolutely justified." *United States v. Heshelman*, No. 06-CR-44, 2009 WL 1409472, at *4 (W.D. Mich. May 20, 2009). The only justification that the government offered for its wait-and-see approach, merely hoping that Heshelman would return to the United States voluntarily, was its uncertainty about whether the Swiss would extradite Heshelman on the money laundering charges if it asked the Swiss to do so. Further, that uncertainty was revealed only by the testimony of Agent Wetherbee. Wetherbee's testimony was not corroborated or supported. The government did not introduce any evidence concerning why Wetherbee thought that it was possible that the Swiss might decline to extradite on the money-laundering charges. The "why" is crucial to establishing the reasonableness of Wetherbee's subjective uncertainty as to the reasonableness of that uncertainty, and more broadly, the reasonableness of the government's basing its three years of lack of concrete action on that uncertainty. Without the government satisfactorily explaining its actions, it was clear error for the district court not to have weighed this factor against the government.

---

11. The portion of *Cooter & Gell* cited by the *Doggett* Court discusses how "[t]he considerations involved in the Rule 11 context are similar to those involved in determining negligence, which is generally reviewed deferentially." *Cooter & Gell*, 496 U.S. at 402 (citing *McCallister*, 348 U.S. at 20–22) (additional citation omitted).

20

I therefore agree with the majority that the unsatisfactory reason provided by the government for the delay, combined together with the 39-month delay, raises the presumption of prejudice, *see* Maj. Op. at 16–17 (citing *United States v. Ferreira*, 665 F.3d at 701, 709 (6th Cir. 2011)), thereby enabling Defendants to establish a violation of their speedy trial rights, *see United States v. Graham*, 128 F.3d 372, 375 (6th Cir. 1997). For the foregoing reasons, I concur in the majority opinion.